UNITED STATES *v.* UTAH, NEVADA AND CALIFORNIA STAGE COMPANY.

UTAH, NEVADA AND CALIFORNIA STAGE COMPANY *v.* UNITED STATES.

APPEALS FROM THE COURT OF CLAIMS.

Nos. 51 and 52. Submitted November 8, 1905.—Decided November 27, 1905.

In construing a contract for mail service in New York City, *held* that:

The new and additional mail messenger or transfer service which the contractor could be required to perform under authority of the Postmaster General without additional compensation did not include a vast amount of additional work necessitated by the opening of a new post office not contemplated by either of the parties when the contract was made.

The same principles of right and justice which prevail between individuals should control the construction and carrying out of contracts between the Government and individuals.

The contractor had a right to presume the Government knew how many stations were to be served; and, where the proposals positively specified that only two elevated railroad stations were to be served, the contractor was entitled to extra compensation for serving four stations notwithstanding the proposal required the bidders to inform themselves as to facts and stated that additional compensation would not be allowed for mistakes.

The contractor was not entitled to extra compensation for "foot service," carrying mails up and down steps at elevated railroad stations, as delivery at the foot of the steps would have been insufficient.

THIS is an appeal and cross-appeal from a judgment of the Court of Claims upon a demand for extra compensation in the performance of a contract made on December 21, 1892, between the United States, represented by the Postmaster General, and the Utah, Nevada and California Stage Company, for the rendition of certain covered regulation wagon, mail messenger, transfer and station service on mail route number 207,003, in the city of New York, for a term from July 1, 1893, to June 30, 1897. The advertisement contained certain instructions to bidders, a part of which is as follows:

"The contractors under this advertisement will be required to perform, without additional compensation, any and all new or additional service that may be ordered from July 1, 1893, or at any time thereafter during the contract term, whether between post offices and railroad stations, between post offices and steamboat landings, between post offices and mail stations or between the several railroad stations, steamboat landings and mail stations now established or that may hereafter be established, whether caused by the establishment of new or by change of site of existing post offices, railroad stations, steamboat landings or mail stations within said cities or caused by the alteration of the routes made necessary by any other reason.

"The statements of probable additional service that may be necessary on the routes under this advertisement are given so that bidders may be as fully advised as possible of the amount likely to be required. It will not, however, limit the

liability of the contractors to perform all service that may become necessary without additional pay.

"Bidders must inform themselves of the distances, the running time, the weight of the mails, the condition of hills, streets, toll bridges, ferries, and obstructions of all kinds, whereby expense may be incurred, and as to the probable increase, additional service, or changes likely to be rendered necessary. Claims for additional pay based on such grounds, or for alleged mistakes or misapprehensions as to the service required, or for bridges destroyed or ferries discontinued, cannot be considered."

The Stage Company, having submitted a proposal under this advertisement, was awarded the contract, and the same was duly entered into. Among other things it was stipulated:

"To take the mail from and deliver it into the post offices, mail stations and cars at such points and at such hours, under the directions of the postmaster at New York, N. Y., approved by the Postmaster General, as will secure dispatch and connections and facilitate distribution, and at the contractor's expense for tolls and ferriage.

"To perform all new or additional or changed covered regulation wagon, mail messenger, transfer, and mail station service that the Postmaster General may order at the city of New York, N. Y., during the contract term, without additional compensation, whether caused by change of location of post office, stations, landing, or the establishment of others than those existing at the date hereof or rendered necessary, in the judgment of the Postmaster General, for any cause, and to furnish such advance or extra wagons from time to time for special or advance trips as the Postmaster General may require, as a part of such new or additional service."

After the contract was entered into, Congress having made an appropriation for the purpose, a new distribution station was established at Forty-fourth street and Lexington avenue, in the city of New York, known as the Industrial Building station. At the time of the advertisement for proposals,

which resulted in the contract, to wit, on September 15, 1892, the service therein referred. to involved the carrying of the mails for approximately 973,674.22 miles per annum. In the advertisement bidders were notified that the probable annual increase in such service would amount to 6,718.40 miles. Between the time of the advertisement and the time when complainant entered. upon the performance of his contract additional service was required, which increased the amount of annual mileage to 1,012,604.54 miles. On August 22, 1893, an order was made by the Second Assistant Postmaster General, requiring additional mail service to supply the mail station at Forty-fourth street and Lexington avenue, as per certain statements attached to the order, and a further order was made on October 23, 1893, for additional mail station service. Under the arrangement ordered by the department, all first class matter (letters) previously collected in the district of Station H (removed into the Industrial Building from 156 East Fifty-fourth street) continued to be received and handled there; massed matter made up by the States for the East, North and West, which had previously been sent to the general post office for distribution, was sent to the Industrial branch to be distributed. South and West mail was taken there during the period within suit and assorted, and all of the second-class bulky matter of publishers above Fourteenth street, which had formerly been received at the general post office and Station O, was delivered at the Industrial Building; also, all third and fourth class matter, mailed in uptown stations, which had previously come to the general post office, was sent to the Industrial Building, relieving the general post office from handling that matter. The result of the orders aforesaid was that claimant was compelled to increase the number of wagon trips from October 25, 1893, to February 6, 1895, over and above what would have been the normal increase, and increased the distance to be traveled by the wagons, over and above the normal increase, 311,939 miles for the period from October 5, 1893, to February 6, 1895.

The Industrial Building was rented in March, 1893, for postal purposes, in order to relieve the general post office, which had become inadequate to accommodate the increased volume of business. Station H, on May 1, 1893, was moved from 156 East Fifty-fourth street into the Industrial Building. In connection with Station H there were inaugurated in the premises the district departments, variously known as district stations.

By establishing the distribution station in the Industrial Building, and issuing the orders above set forth, there was no diminution in the number and character of the runs to and from the general post office, nor was the mileage at said general post office thereby diminished. To perform this extra service to and from the Industrial Building the claimant was required to purchase from 80 to 100 additional horses, and from 32 to 33 additional wagons; to put on from 45 to 46 new runs, and to employ from 33 to 50 additional men—drivers, hostlers, etc. The orders resulted in such increased speed in carrying the mails from the Industrial Building to some of the railroad stations, that in obeying them it was necessary to violate the city ordinances as to the rate of speed; it largely increased the wear and tear on the wagons; it injured and shortened the period of usefulness of the horses, some of them dying from overexertion in hot weather by reason of the fast driving, made necessary by the short time allowed to make the various trips.

The increase of runs to the railroad stations outside the city of New York, made necessary by the establishment of the extra service from the Industrial Building, increased the necessary expenditure by the claimant, in the matter of ferry tolls, in the sum of $9,950.22.

At no time prior to the making of said bid, or prior to entering into said contract, was any intimation or information given by the defendants' officers to claimant that they contemplated or intended the establishment of a service at the Industrial Building.

A postal station was established in the Industrial Building, and the contractor was required to transport the mails between it and the various railroad stations and some postal stations. This postal station was constituted as follows:

"Station H was moved May 1, 1893, from its location at No. 156 East Fifty-fourth street into the above-named premises.

"Thereafter, on September 1, 1893 (service began October 4, 1893), there was inaugurated in the same premises and in connection with Station H the distribution department, which was variously known as 'Distribution station,' 'Industrial station,' and 'Station H (distribution department),' and the two together were sometimes known as 'Industrial Branch station.'

"Before and after the removal of Station H, as above stated, it was in all respects a branch post office, at which there were collections and deliveries of mail by carriers, distribution of mail matter for dispatch, registration of letters, sale of stamps, and the issuing of money orders.

"Both that part of the industrial branch which had been known as Station H, and that part which was referred to as 'Distribution station,' etc., were situated on the same floor of the Industrial Building, and were at all times connected by a passageway. The former was in charge of a superintendent of station, and the latter was, until January 5, 1895, under the direction of an assistant of the superintendent of mails of the general post office. Station H continued the collection and delivery of mail by carriers, the sale of stamps, the registration of matter, and sale of money orders, while the distribution department had charge of the distribution of second, third and fourth class matter. The collectors for Station H proper carried their collections of mail directly into and deposited them in the distribution department and the distribution for dispatch and the assortment for city delivery were made there.

"After the equipment of Industrial Branch station, second class mail matter mailed by publishers and originating north of Fourteenth street was mailed at that station.

"This mail matter had previously been mailed at the general post office and at Station O, at which points the distribution had theretofore been made and dispatch made to the several railroad stations, as specifically stated in the advertisement. Thereafter no further such mailing of second class matter was made at Station O, and all dispatches of said mailed matter for the West and New England States and to and from Grand Central Station were made from the Industrial Branch station, a distance of approximately 6 blocks, instead of from the general post office, $3\frac{1}{2}$ miles distant, and from Station O, $1\frac{3}{4}$ miles distant, as theretofore.

"The congested state of the general post office on account of lack of adequate space, for the remedy of which Station O had been established some years before, was well known for some time prior to the advertisement and proposal for this service."

The advertisement of September 15, 1892, containing provision for covered regulation wagon, mail messenger, transfer and station service, which was made a part of the contract, undertook to give a schedule of service probably required in the city as the same existed and was in operation on August 15, 1892, as stated in the advertisement, "so that bidders might be as fully advised as possible of the amount of service likely to be required." The advertisement inadvertently stated the service between the Manhattan Elevated Railroad station and the general post office and certain branch stations at one-half of the number of transfers actually required, consequently the Stage Company was required to perform, and did perform, double the number of trips specified.

In the performance of the contract certain foot service was required, which, it is contended, was not included in the contract, which necessitated 479,875 trips going up and down steps in making delivery of mail to messengers on elevated trains, the service requiring the employment of additional men at each station.

From the findings of fact the Court of Claims held the com-

plaintiff entitled to recover the sum of $68,483 as compensation for the additional service under the orders of the department, made necessary by the establishment of the extra service in connection with the Industrial Building, the sum including $9,950.22 expenses incurred by the Stage Company in the matter of ferry tolls; also $14,538 because of the double service required between the Manhattan Elevated Railroad and the general post office, and certain branch post offices, growing out of the mistake in the advertisement in stating the number of trips required at one-half the actual number. It disallowed the claim for extra compensation on account of the "foot service" required in delivering the mail upstairs at the elevated railway stations. 39 C. Cl., 420, 440.

*Mr. Assistant Attorney General Louis A. Pradt* and *Mr. Joseph Stewart* for the United States.

*Mr. A. A. Hoehling, Jr.,* and *Mr. J. H. McGowan* for Utah, Nevada and California Stage Company.

MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

It is the contention of the Government that, under the authority of the Postmaster General to require new or additional mail messengers or transfer service, without additional compensation, the contractor might be required to perform the additional service made necessary by the establishment of the Industrial Building branch under the authority of the act of Congress of March 3, 1893, 27 Stat. 732, authorizing the renting of the building to be used for general post office purposes in the city of New York. The findings of fact establish that this Industrial Building branch was more than three miles distant from the general post office, and was intended to and did transact nearly all of the business north of Fourteenth street. This necessitated the carrying of the mails not only from the

general post office to the railroad stations, but to and from the
branch station established at the Industrial Building.    In or-
der to perform this service under the directions of the depart-
ment, complainant was required to furnish eighty additional
horses, more than thirty additional wagons, and from thirty-
three to fifty additional men, requiring an additional distance
to be travelled in wagons, over and above the normal increase,
of 311,939 miles for the period from October 5, 1893, to Feb-
ruary 6, 1895, and to pay an increased sum for ferrying the
wagons across the North and East Rivers of $9,950.22.    Can
such enormous increase of the service required and the expense
entailed be exacted of a contractor who had agreed to perform
new or additional service of the kind specified without addi-
tional compensation?    There can be no doubt that the purpose
of placing this stipulation in the contract was to require the
performance, without additional compensation, of new or ad-
ditional service which might arise from improved methods in
the transaction of the business of the Post Office Department
and in the increased demand for service resulting from the
growth and development of towns and cities.    The contract
gave to the Postmaster General very considerable discretion
in calling for additional service which might result from these
causes, without compensation.    This was well illustrated in
the case of *Slavens* v. *United States,* 196 U. S. 229, in which it
was held that while the Postmaster General might not order,
under such a contract, service of a different character not within
the contractual arrangement, he might order, without addi-
tional compensation, a change in the service which required
the mail to be taken to and from street cars, met at crossings
instead of landings and stations.    In that case it happened the
burden upon the contractor was not increased.    But in the
present case we find more service required, amounting to addi-
tional mileage of hundreds of thousands of miles, and the pay-
ment of a large additional sum of money for ferrying wagons
to deliver the mails.    There must be some limit to the service
which can be required without additional compensation, under

the authority vested in the Postmaster General by the contract, to call for new or additional service of the same character. Otherwise it is within the power of the Government to ruin a contractor by new and wholly unanticipated demands, which caution and prudence, however great, could not have foreseen. If this were a contract between individuals a claim of the right to require this vast amount of additional work—evidently not within the contemplation of the parties—without additional compensation, would hardly be seriously entertained. The same principles of right and justice which prevail between individuals should control in the construction and carrying out of contracts between the Government and individuals. The phrase "new or additional service" is not one of exact meaning, defining the precise extent of the obligation incurred, and permits the court to give it a reasonable construction with a view to doing justice between the parties. In giving a proper construction the court is required to examine the entire contract, to consider the relation of the parties and the circumstances under which it was signed. *Rock Island Railway* v. *Rio Grande Railroad,* 143 U. S. 596, 609. It was said by Mr. Justice White, in *O'Brien* v. *Miller,* 168 U. S. 287, 297:

"The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them. *Boardman* v. *Reed,* 6 Pet. 328; *Canal Co.* v. *Hill,* 15 Wall. 94."

And, upon the same subject, Mr. Justice Bradley, in the case of *Canal Co.* v. *Hill,* 15 Wall. 94, 99, said:

"We should look carefully to the substance of the original agreement . . . as contradistinguished from its mere form, in order that we may give it a fair and just construction, and ascertain the substantial intent of the parties, which is the fundamental rule in the construction of all agreements."

We cannot believe it possible that the parties to this contract contemplated the establishment of a new postal depart-

ment in the city of New York, not then authorized by any act of Congress, which should so greatly increase the service, requiring more than 300,000 miles of additional transfer service and nearly $10,000 of additional expense for ferrying during the time covered in the suit. The Government, in its advertisement, had stated the probable additional annual mileage at 6,718.40 miles. This may be presumed to have been a fair and impartial estimate, made for the benefit of those with whom the Government was about to contract, notwithstanding they were warned that it was not conclusive. There is nothing in the record to show that it was not a reasonable estimate in the light of the facts then known. In this case, after the contract was entered into, this enormous new service, clearly not intended by either of the parties to be rendered, was required. In this instance we think the limit of reasonable requirement under the new and additional service clause was exceeded and the service required cannot be held to be within the terms of the contract. We find no error in the Court of Claims reaching this conclusion.

2. The second question involved is as to the right of the contractor to recover because the Government's advertisement for proposals, instead of stating the number of elevated stations to be served at four, which was, in fact, the number, gave the number of stations at two, thus doubling the number of trips necessary. It is true that the advertisement required the bidders to inform themselves as to the facts, and stated that additional compensation would not be allowed for mistakes; but, in the present instance, the Government in its advertisement had positively stated the number of stations at two. The contractor had a right to presume that the Government knew how many stations were to be served; it was a fact peculiarly within the knowledge of the Government agents and upon which, in the advertisement, it spoke with certainty. We do not think, when the statement was thus unequivocal, and the document was prepared for the guidance of bidders for Government service, that the general statement that the contractor must in-

vestigate for himself, and of non-responsibility for mistakes, would require an independent investigation of a fact which the Government had left in no doubt. We think the Court of Claims correctly allowed this item.

3. As to the compensation for the so-called "foot service," for carrying the mails up and down the steps at the elevated railroad stations, the delivery of the mail at the foot of the steps would not have been sufficient, and the contractor agreed to deliver the mail into the post offices, mail stations and cars. The statement of facts shows that the preceding contractor had delivered the mail on the platform of the stations at the door of the cars. We think the contract was not exclusively for wagon service, but, reasonably construed, required the delivery of the mail into the elevated stations in such wise as to be placed in the cars, and consequently required it to be carried upstairs without extra allowance of pay. We find no error in disallowing this claim for extra compensation.

The judgment of the Court of Claims is

*Affirmed.*