## POTTSVILLE CASTING & MACHINE SHOPS, Inc. v. UNITED STATES.

No. 49092.

United States Court of Claims.

Dec. 4, 1951.

Hyman D. Lehrich, New York City, for plaintiff.

Kendall M. Barnes, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff operated a job-shop type of manufacturing establishment at Pottsville, Pennsylvania. Its facilities are described in Finding 2. Its work was a non-repetitive type of manufacturing, as distinguished from the repetitive, or assembly line, operations of large, high-production factories.

In March 1944 a representative of the Philadelphia Ordnance District of the War Department invited the plaintiff to submit a proposal for the conversion of a quantity of 155 millimeter shells. The plaintiff did so informally, and on April 5, 1944, submitted its proposal on War Department forms, for the conversion of 125,000 shells. In the breakdown of its estimated costs it stated that its indirect factory expenses were allocated on the basis of direct labor.

There were negotiations and by letter of April 12, 1944, the plaintiff offered to convert 85,000 shells at a unit price of $4.77 each, subject to a redetermination of the unit price based upon a preliminary run of 20 percent and a trial run of 20 percent of the work covered by the proposed contract. The Government accepted the proposal by a written notice of award which said that the agreement would be embodied in a written contract. The contract was dated May 1, 1944, and presented to the plaintiff. The plaintiff signed it on May 29, but did not deliver an executed copy of the contract to the Government until about July 7. In the meantime, the Government began in April to send shells to the plaintiff requesting that it begin to work on them, which the plaintiff did. About July 1, the plaintiff learned that the Government was questioning the plaintiff's method of allocating its general overhead to the costs of the contract, for the purpose of redetermining its costs for the final fixing of the unit price of the shells. Thereupon the plaintiff telephoned to the Government's agent with whom it had been dealing, and advised him that it would not enter into the contract until that question was clarified. The parties then agreed to confer on July 5. On that day, the contracting officer, who employed a large staff of assistants, referred the plaintiff to representatives of the contracting officer's legal and fiscal branches. It was the function of the fiscal branch to pass upon the acceptability of accounting procedures used by contractors with the Government for the purpose, among others, of assisting the contracting officer to determine the prices to be paid under the price revision articles of contracts.

The conversation at the July 5 conference is described in Finding 5. The defendant's representatives agreed that in the redetermination of the unit price to be paid the plaintiff, the plaintiff's accounting procedure would be used. This agreement was embodied in a writing, quoted in Finding 5, made by an authorized agent of the contracting officer. Having obtained its desired clarification of a troublesome provision of the contract, the plaintiff on July 7 delivered an executed copy of the contract to the Government.

The plaintiff duly performed this contract and a second one for the conversion of 40,000 shells which provided that the unit price for those shells should be the price determined for those converted under the first contract. At an appropriate time the plaintiff submitted to the Government reports showing its costs during the preliminary and test runs under the first contract. The accountant who prepared these reports first conferred with a representative of the fiscal branch of the Philadelphia Ordnance District, and was told to prepare them in accordance with the job order system of accounting used by the plaintiff. The reports showed that the unit cost during the preliminary run was $4.286 per shell and during the test run $3.5312 per shell.

The Government sent a representative of its audit section to the plaintiff's plant for the purpose of making a limited field review of the plaintiff's books and records. During that review the plaintiff's assistant treasurer showed the Government's auditor summary sheets showing plant overhead apportioned between the plaintiff's foundry and its machine shop. These sheets were prepared and used exclusively for the guidance of the management, and were not used by the plaintiff for making estimates, determining the costs of jobs performed, preparing tax returns, or other purposes having to do with persons outside the plaintiff's organization. Why they were limited to only two of the plaintiff's several departments and whether they represented good accounting practice we do not know, because the plaintiff did not call as a witness the person who prepared them. We think it was unfair to the court and to the Government not to call him, to help clarify a troublesome problem.

The Government's auditor made a report, which is quoted in Finding 11, which took exception to the plaintiff's method of allocating indirect factory expense. It said that the whole period of performance of the contract should be used, rather than the monthly period which the plaintiff used. A further report of the fiscal branch to the contracting officer, quoted in Finding 12, took direct exception to the plaintiff's failure to segregate its indirect factory expense as between its foundry and machine shop, saying that the contract in question had been performed entirely in the machine shop.

The contracting officer then made his written findings of fact, quoted in part in Finding 13, in which he adopted the recommendations of the fiscal branch and reduced the plaintiff's indirect factory costs from the $78,389.78, shown in the plaintiff's report, to $45,303.11. The plaintiff sues for this difference.

The Government has filed a counterclaim which seeks a judgment against the plaintiff for $52,379.19, asserting that the plaintiff has been overpaid.

■ The plaintiff says that it was entitled to have its indirect factory costs computed by the method which it used in its report of costs, and which it had been in the habit of using. It points to the conference and writing of July 5, 1944, referred to above, and says that that was a specific agreement of the parties to so compute them. The Government urges that the contract had already been made before that date, and hence there was no consideration for the agreement. The plaintiff's offer had been made, which included a provision for a redetermination of price after a preliminary run and a test run. The plaintiff then contemplated using its own method of cost accounting. The Government made an award, which said that it was to be embodied in a formal written contract. When that contract was sent to the plaintiff, with its Article 32 which lodged the power in the contracting officer to disapprove the plaintiff's system, the plaintiff refused to return a signed copy of the contract to the Government. It had not, by its proposal, offered to agree to whatever system of redetermination the Government might write into the formal contract, and it was not bound to agree to it. That question was still open, and the Government recognized that it was still open, when the contracting officer referred the plaintiff to fiscal and legal officers to negotiate a solution. A solution was negotiated, which was intended to clarify the disputed term of the contract.

■ The Government urges that the agreement represented by the writing was not made by a person authorized to bind the Government. It was made by the person on the contracting officer's staff to whom the plaintiff was referred by the contracting officer for the purpose of reaching an agreement. There was no lack of authority.

The Government urges that the agreement was induced by the misrepresentation of the plaintiff that it would be *impossible* for it to use any other system of accounting than its accustomed one, which was the usual job-shop method. The persons to whom the plaintiff made this statement were members of the fiscal branch of the contracting officer's establishment, skilled in appraising the accounting methods of contractors with the Government. Of course they knew that it was not literally

impossible to use some other method of accounting. They must have known that the plaintiff meant that it would be troublesome and expensive, and that the plaintiff would not do it, and would add to their troubles by refusing to execute the contract if they insisted upon it. The evidence that the plaintiff's assistant-treasurer had in fact been making, for use inside the plaintiff's own organization, summaries which attributed overhead separately to two of the plaintiff's several branches, seems to us not to be relevant to what happened at the July 5 conference. In effect, the plaintiff said, "We won't agree to convert the shells unless we may use our system of cost accounting" and the Government said "we agree that you may use your own system."

The effect of the July 5 agreement was to eliminate from the formal contract the authority of the contracting officer to reject the plaintiff's system as "inadequate" or not "in accordance with sound accounting practices." When, therefore, he later attempted to do that, he was violating the contract, as it stood after modification by the July 5 agreement. In his action he also violated the contract in another respect. The contract provided that the costs incurred in the preliminary run and the test run should fix the contract price for the rest of the work. The contracting officer, however, used the indirect factory costs for the entire period of performance of the first contract as his standard.

The Government says that the plaintiff is barred by its failure to appeal the contracting officer's decision to the head of the department within the time specified in the contract. The contract contained the conventional Article 15 which concerned only disputed questions of fact. The questions here were questions as to the validity and proper interpretation of the July 5 modification of the formal contract and of certain provisions of Article 32 as they appeared in the formal contract. These are not "questions of fact" within the meaning of Article 15. Martin Wunderlich v. United States, 117 Ct.Cl. 92; 212 reversed by the Supreme Court of the United States in part and on other grounds,

72 S.Ct. 154; McWilliams Dredging Co. v. United States, 118 Ct.Cl. 1, 16. The contracting officer and the head of the department did not have authority to finally decide them.

The Government says that, in any event, the overhead or indirect factory costs as ascertained by the plaintiff's method were too high, as shown by the actual figures available after the contracts were completed. But both the plaintiff and the Government agreed that the price of the work should be determined by the preliminary and test runs. Each took its chances that the costs of those runs would not be maintained throughout the remainder of the work. That risk is ever greater in the normal lump sum contract. That fact does not, however, permit the contractor or the Government to modify the contract because the outcome does not satisfy it.

The plaintiff is entitled to a judgment for $37,033.40.

The defendant's counterclaim will be dismissed.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.