**RAILROAD WATERPROOFING CORPORATION**
v.
**The UNITED STATES.**
No. 102–53.

United States Court of Claims
Jan. 31, 1956.

Caesar L. Aiello, Washington, D. C., Wilbur D. Preston, Jr., Baltimore, Md., on the briefs, for plaintiff.

Francis P. Borden, Jr., El Dorado, Ark., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

Plaintiff seeks to recover additional expenses incurred in executing a Government contract. The increased costs resulted, it alleges, from errors in the Government's specifications.

The contract was for cleaning and resealing joints on the runways, taxiways, parking stems, and hardstanding areas at Andrews Field, Maryland. The specifications described three types of joints with the total amount of lineal footage of each type, as follows:

Traverse Expansion Joints .... 27,600
Normal Expansion Joints ..... 127,100
Construction, Contraction
   and Dummy Joints ........ 788,600

One of the drawings with which plaintiff was supplied by the Government and which subsequently became part of the contract purported to show one typical cross section for each of the three types of joints. Had the specifications been correct both as to length and as to cross section about 300 tons of resealing material would have been needed to do the job.

Actually the specifications were erroneous both as to the average size of the joints and as to their total length. In the performance of the contract the joints proved to be smaller than the cross section drawings, whereas the actual lineal footage was as follows:

Traverse Expansion Joints .... 56,400
Normal Expansion Joints .... 73,800
Construction and Contraction
   Joints .................... 806,250

The plaintiff calculated that the change in lineal measurement had the following effect on the cost of performing the contract:

Traverse Expansion Joints
   (add) ................. $26,518.95
Normal Expansion Joints
   (deduct) .............. 7,899.34
Construction and Contraction
   Joints (add) ........... 1,572.96

Plaintiff's president made an inspection of the field prior to bidding on the job. He became aware at that time that the average joint specifications were incorrect and did not rely upon them. He did not apprise the defendant's agents of this fact. Plaintiff's president did rely upon the correctness of the lineal measurements of each type of joint. Both the Government's engineer and plaintiff's president proceeded on the erroneous assumption that the large traverse expansion joints were not on the taxiways, as is normally the case. At Andrews Field, however, the taxiways did have such large joints.

Plaintiff's agents could not feasibly have made an actual check on the lineal measurements prior to bidding since that involved measuring some 175 miles of joints. By use of maps furnished by the defendant both parties could have computed the total length of the traverse expansion joints correctly had they not labored under the misapprehension as to the nature of the joints on the taxiways. This misconception accounted for the fact that plaintiff's president did not notice the major error in the specifications.

Plaintiff's president, relying on the Government's lineal measurements, estimated 185 tons of filling material would be required to complete the job. He submitted the bid in accordance with this estimate. After the work had been partly completed, plaintiff's superintendent first noticed that there were considerably more traverse expansion joints than had been specified. He called this matter to the attention of Mr. Starkey, who was the principal engineer and assistant air installations officer at Andrews Field. Mr. Starkey requested that the work proceed and stated that remeasurement would be made to determine whether there was additional footage, in which event plaintiff would be compensated.

Plaintiff's president had further negotiations with the Government's agents at the field concerning this error. He stated at that time that he was making a claim for extra work, but no request was ever made in writing on the part of the Government that plaintiff perform extra work, nor was a change order ever issued on the mistake in specifications. Meanwhile the work proceeded until suspension during the severest weather of the winter of 1946–47. The job was finally completed in April 1947. Plaintiff had used about 200 tons of sealing material in executing it.

Under date of April 15, 1947, plaintiff submitted a request for "additional payment" on account of the errors in the specifications described above. The figures and computations in this letter as well as an earlier similar letter were agreed upon between plaintiff's president and Mr. Starkey. Neither letter

came to the attention of Mr. Stone, the contracting officer, until a year later. At that time plaintiff submitted an invoice including $1,799.98 due under the contract and $20,192.57 for work because of the incorrect lineal measurements. Mr. Stone then discovered the previous claim letters in the files of the air installations office. Without any further communications between the parties Mr. Stone, under date of June 17, 1948, made certain purported findings of fact and decision rejecting plaintiff's claim.

The findings of fact and decision appear to have been a decision based solely on legal considerations. They recited the terms of the contract documents, found that no extra work, materials or changes had been ordered by the contracting officer, stated that any work performed by the contractor in variance with or in addition to the contract was performed at its own risk and without order from the contracting officer, and decided that no amount was due the plaintiff over and above the unpaid balance of the contract price. The contracting officer failed to make any findings as to the extra work plaintiff had to do on account of the lineal measurements. The covering letter for Mr. Stone's findings of fact and decision called attention to the "Disputes" clause of the contract and advised that any appeal should be made to the Board of Contract Appeals.

Plaintiff's president was absent on an extended business and vacation trip when Stone's letter arrived. The letter remained unopened until the return of plaintiff's president, by which time more than 30 days had elapsed since the mailing of the findings of fact and decision. Plaintiff submitted an appeal to the Board of Contract Appeals but that agency, after detailing the facts of the case, rejected the appeal because it had been submitted too late.

■■ It is evident from our recital of the facts that plaintiff made its bid in reliance on erroneous specifications of the Government. It was entitled to rely upon these representations, not only because they were a matter in which the Government had special knowledge, but also because the plaintiff could not reasonably have discovered the mistake by inspection. It is well-settled law that the Government must answer in damages where it has thus misled one of its contractors. United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735; Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898; United States v. Johnson, 9 Cir., 153 F.2d 846; Arcole Midwest Corp. v. United States, 113 F.Supp. 278, 125 Ct.Cl. 818.

The defendant has raised the point that plaintiff is precluded from seeking relief in this court because it has not exhausted its remedies under article 15 of the contract. That article provided in part:

"15. DISPUTES. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto."

Since plaintiff did not take an appeal within 30 days, defendant contends that it is precluded from seeking relief in this court.

■ Were this a matter over which the contracting officer or the Secretary of War (or his designated representative) had authority, we might agree with defendant's contention. But the claim is one for unliquidated damages. Over such claims the executive departments decline to exercise jurisdiction, on the ground that they are not within their authority. Continental Illinois

National Bank v. United States, 101 F. Supp. 755, 121 Ct.Cl. 203; Pottsville Casting and Machine Shops v. United States, 101 F.Supp. 370, 121 Ct.Cl. 129; Anthony P. Miller, Inc., v. United States, 77 F.Supp. 209, 111 Ct.Cl. 252. Since the contracting officer had no authority to decide a claim of this kind it was not necessary to appeal from his decision. Pottsville Casting and Machine Shops v. United States, supra; Anthony P. Miller, Inc., v. United States, supra; see also Allied Contractors, Inc., v. United States, 124 F.Supp. 366, 129 Ct.Cl. 400.

■ Defendant stressed the contention that the Government should not be held for the error in the lineal footage as set out in the specifications since the invitations, by reason of a counter-balancing error in the cross section specifications, did not mislead plaintiff as to the total quantity of filling material necessary. The Government's specifications estimated that 300 tons of material would be needed. The plaintiff, realizing that the average cross section drawings were inaccurate but relying on the lineal footage specified by the Government, estimated 185 tons. The plaintiff actually used somewhat more, that is, 200 tons. The Government therefore argues that plaintiff still used 100 tons less than the Government's estimate. The fact remains, however, that plaintiff relied primarily on the accuracy of the lineal measurements. Had it called attention to the Government's other mistakes, of which it was then aware, it would not have altered its bid. Perhaps the other bidders would have made lower bids. But it was not incumbent upon plaintiff to correct errors in the specifications; it was incumbent upon the Government to make them reasonably accurate. Moreover, plaintiff's president stated that the average cross sections given in the specifications did not compare to any actual joints and were "worthless." He may well have supposed that the error was so patent that no experienced contractor would have relied on them.

■ Nor do we think that the Government is right in contending that plaintiff was not damaged. The evidence does not show that the discrepancy between the 185 tons which plaintiff estimated for the job and the 200 tons which it actually used was the result of normal inaccuracies in estimating for which plaintiff may be supposed to have made allowances in its bid price. Nor does it establish that this discrepancy was due to the joints' excessive expansion which plaintiff left out of account and which plaintiff would not have encountered had it not delayed performance into the colder months of the year. The trial commissioner who heard the evidence has determined the value of plaintiff's damages resulting from the errors in the Government's specifications, minus such savings accruing to plaintiff where the Government had overstated the lineal footage. We adopt his finding that the fair and reasonable net damages amounted to $16,000. Plaintiff is, therefore, entitled to recover $16,000, and judgment will be entered in its favor in that amount.

It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.