NELSE MORTENSEN & CO., Inc.,
Plaintiff,

v.

UNITED STATES of America and Washington Water Power Company,
Defendants.

UNITED STATES of America,
Third Party Plaintiff,

v.

John R. CULLER, Fulton G. Gale, Jr., Carroll Martell, Kenneth P. Norrie, Walter Z. Davis, Royal A. McClure, Thomas R. Adkison, Bruce W. Walker, John W. McGough, and Edna D. Spafford as Executrix of the Estate of Russell M. Spafford, Deceased, Third Party Defendants.

Civ. No. 3028.

United States District Court
E. D. Washington, N. D.

July 1, 1969.

Lycette, Diamond & Sylvester, Seattle, Wash., for Nelse Mortensen & Co., Inc.

Dean C. Smith, U. S. Atty., Spokane, Wash., for the United States.

Paine, Lowe, Coffin, Herman & O'Kelly, Spokane, Wash., for Washington Water Power Co.

Lane, Powell, Moss & Miller, Seattle, Wash., for the Architects.

Delay & Curran, Spokane, Wash., for Estate of Russell M. Spafford, deceased.

## OPINION

## NATURE OF PROCEEDINGS

EAST, Senior District Judge (sitting by designation).

The plaintiff, Nelse Mortensen & Co., Inc., (Contractor) seeks Tucker Act, Title 28, Sec. 1346(a) (2) relief from the defendant United States of America (Government) upon an alleged breach by the Government of an implied warranty flowing from a building contract (T.Ex. 102 and 102–A)[1] in that the Government supplied Contractor with alleged inaccurate architectural and structural plans and drawings, particularly drawing 1–1 (T.Ex. 103), Existing Survey (i.e., delineation thereon of an incorrect location and direction of the conduit).

Contractor joined defendant Washington Water Power Company (Power), the owner and user of an underground high-tension "P & S" electrical conductors with concrete envelope (conduit) located under Main (northerly) and Monroe (westerly) Streets bordering the building site, as a proper, but not a necessary, party defendant.

It appears that Power's conduit was inadvertently, as distinguished from intentionally, fractured during the course of the Contractor's excavation work for the building with a resulting cost and expense to Power for repairs exceeding $10,000 and that Power had threatened the contractor with suit or action to collect.

Power counterclaimed against the Contractor for the reasonable and necessary cost and expense of repair in an amount exceeding $10,000 claiming to have third party beneficiary rights and status under the building contract,[2] and further cross-claimed against the Government under the Tucker Act, seeking to recover its cost and expense of repairs in an amount not to exceed $10,000 should recovery not be had from the Contractor.

The Government's during-trial motions:

1. For summary judgment against Contractor on grounds of lack of jurisdiction, was denied;[3]

2. For summary judgment against Power on its cross-complaint on grounds of lack of jurisdiction, was allowed; and

---

1. Construction contract dated September 1, 1965, between the Government, as owner, and the Contractor, as General Contractor for the construction of the United States Court House at Spokane, Washington.

2. Section 7–03, subparagraphs g. and h. provide, inter alia:
   "g. Adjacent * * * utilities * * * should be protected during excavation work. The Contractor shall provide sheet piling or other means of shoring as required to protect facilities adjacent to the site and shall be responsible for any damage to these existing facilities including * * * all existing utilities."
   "h. Existing utility lines to remain and * * *; if damaged shall be repaired at Contractor's expense * * *."

3. This motion had two prongs: (a) lack of jurisdiction of this Tucker Act case under the lesson of United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 567, 85 L.Ed. 1058 (1940), and (b) Contractor's failure to pursue its administrative remedies as required by the "Changed Conditions" and "Disputes" clauses of

the construction contract, General Provisions, Subsections 4 and 6.
   (a) The Government's faith in *Sherwood was misplaced.* There the plaintiff's claim (judgment creditor) was against a third party co-defendant and the claim had to be litigated in the Tucker Act case before a claim arose against the Government. Here Contractor's claim (liability to Power, yet unliquidated) is directly against the Government under the warranties of the building contract.
   (b) Universal Ecsco Corp. v. United States, 385 F.2d 421, 181 Ct.Cl. 10 (1967) answers adversely to Government, "Accordingly, plaintiff's breach of contract claim for unliquidated damages is properly before this court without any administrative appeal. Defendant's argument to the contrary is rejected." Citing Railroad Waterproofing Corp. v. United States, 137 F.Supp. 713, 133 Ct. Cl. 911, which tells us that "The claim is one for unliquidated damages. Over such claims the executive departments decline to exercise their jurisdiction on the ground that they are not within their authority."

3. To remove Power as a party defendant, was denied, Rule 20, F.R.Civ. P.

Power's during-trial motion for judgment against Contractor on its counterclaim in the amount of $10,268.81 was allowed.

The Government cross-complained against defendants John R. Culler, Fulton G. Gale, Jr., Carroll Martell, Kenneth P. Norrie, Walter Z. Davis, Royal A. McClure, Thomas R. Adkison, Bruce W. Walker, John W. McGough (Architects) and Edna D. Spafford as Executrix of the Estate of Russell M. Spafford, Deceased (Surveyor) alleging their responsibility for the inaccuracies in drawing 1–1 under Article XVI of their Architects' contract (T. Ex. 101).

It appearing "In order that architects could render their professional service, a survey of the property was required," so through the provisions of Article VI of T.Ex. 101, Surveyor Russell M. Spafford was selected and retained as the surveyor. Thereafter, Spafford issued and published his survey as drawing 1–1. Spafford's drawing 1–1 became a part of the Architects' architectural and structural plans and drawings furnished the Government and in turn to the Contractor for prebidding and construction advice and direction. Spafford's delineation of the location of Power's conduit on drawing 1–1 proved to be inaccurate. Architects cross-complained against Edna H. Spafford as Executrix of the Estate of Russell M. Spafford, Deceased, for indemnity. The issues under the Government's cross-complaint against the Architects and the Architects' cross-complaint against the Spafford estate raised the query, "Was Spafford the agent of the Government or the Architects in issuing and publishing his survey?"

During trial the Court segregated the cross-complaint of the Government against the Architects and the cross-complaint of the Architects against the Estate of Russell M. Spafford until an adjudication of the Contractor's Tucker Act claims against the Government was had.

### PREPARATION AND CONTRACTOR'S USE OF DRAWINGS 1–1 AND 9–E–1

I find from all of the evidence and the admitted facts of the pretrial order herein that:

Spafford's delineation of the location of the conduit on his Existing Survey, drawing 1–1, and denoting the same by a broken straight line interspersed with the letter "P" and labeled "Underground Power Lines" was inaccurate in that he placed the conduit some 35 feet at the most easterly point of interest and some 20 feet at the most westerly point of interest northerly (away from the excavation site) of its true location;

Spafford certified his drawing 1–1 as follows:

"I hereby certify that the drawing correctly shows the boundaries of the property described above and that streets, alleys, sidewalks, curbs, encroachments and surface and subsurface utilities are properly and correctly indicated. Signed R. M. Spafford, Land Survey, State of Washington, No. 7462, date December 18, 1962.",

and presented it initially to the Architects, but the " * * * drawing was not checked for accuracy of the survey by the architects * * * " (Pretrial Order, Contention of Architects) before delivery to the Government and subsequently to the Contractor;

Pittsburgh Testing Laboratory was engaged by the Architects pursuant to the terms of the architectural contract to perform footing test drilling, and during such drilling operations the conduit was struck by a drill. However, the knowledge obtained through this incident and the test borings was

not disclosed to the Government or the Contractor; [4]

The true course and actual location of the conduit was not in a straight line but bears southwesterly in a slow curve from some 35 feet at the northeasterly point of interest to some 1 or 2 feet at the northwesterly point of interest northerly of the called-for excavation and shoring perimeter, which actually placed the conduit in an immediate zone of danger from the caller-for excavation work by the contractor;

Drawing 1–1 is not a pure undimensional drawing as distances are noted on some lines and not on others, and it is specified thereon to have been drawn to a scale of 1 inch to 20 feet;

Depending upon the good use of architects' and contractors' respective rulers, a tolerance of 10% is reasonable in using and depending upon such a drawing by a building contractor in prebid and excavation work planning and execution, unless, of course, and until actual knowledge or reasonable notice to the contrary enters the picture;

By absorbing the full 10% tolerance in the use and reliance upon drawing 1–1, the conduit's location thereon was well without any reasonable foreseeable zone of danger outside the north perimeter of the called-for excavation work and the shoring and resulting banks;

The later-occurring abnormal sluffing, cave-in and fracturing of the conduit could not have been reasonably foreseen at that time;

Subsection h. in the Section 7.03 mentioned in Footnote 2 provides, inter alia:

"Contractor shall contact Utility Companies for information pertaining to location and construction of existing utilities."

Contractor's supervisory personnel made no self-initiated inquiries of either Power or Spokane City Engineer as to the location of the underground conduit and had no independent knowledge of the actual location of the conduit nor any notice that drawing 1–1 was inaccurate as to the location of the conduit and relied upon drawing 1–1 and its teachings in making the estimate of the situation for the prebid and ultimate excavation work planning and execution; and

Drawing 9–E–1 (T.Ex. 108) was a part of the electrical plans for the building dealing with street lighting and electrical power sources and would not under good construction practices and did not enter the Contractor's reading of the architectural and construction plans and drawings and making of an estimate of the situation for excavation and reasonable adequate shoring.

■ It is my opinion that since the Government desired a survey as to the location of a known adjacent underground power conduit (outside the shoring perimeter of the excavation) and/or the Architects did furnish the Contractor with such survey, the Contractor was relieved from any duty to independently determine the location of such conduit and was warranted in relying upon drawing 1–1 in making its estimate of the situation.

"The rule is that where plans and estimates or specifications given out by authorized public authorities as the basis for bids for public work lead an intending public contractor reasonably to believe that conditions indicated in such plans and specifications exist, and may be relied upon in making his bid, may recover on a quantum meruit compensation for extra work or expense made necessary by conditions being other than as represented therein. This rule is especially applicable where the representation as to conditions is positive, in which case the right of the contractor is not affected

---

4. These core drilling holes become of importance later.

by general language of the contract to the effect that he is expected to investigate facts for himself * * *." (43 Am.Jur. 852, Public Works and Contracts.)

"A government contract should be interpreted as are contracts between individuals, with a view to ascertaining the intention of the parties and to give it effect accordingly, if that can be done consistently with the terms of the instrument. In paragraph 33 the specifications spoke with certainty as to a part of the conditions to be encountered by the claimants. True the claimants might have penetrated the 7 feet of soft slushy sediment by means which would have discovered the log crib work filled with stones which was concealed below, but the specifications assured them of the character of the material,—a matter concerning which the government might be presumed to speak with knowledge and authority. We think this positive statement of the specifications must be taken as true and binding upon the Government, and that upon it, rather than upon the claimants must fall the loss resulting from such mistaken representations. We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specifications furnished by the Government as a basis of the contract left in no doubt. If the government wished to leave the matter open to the independent investigation of the claimants it might easily have omitted the specification as to the character of the filling back of the dam. In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity." Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914) citing United States v. Utah, Nevada & California Stage Co., 199 U.S. 414, 26 S.Ct. 69, 50 L.Ed. 251 (1905).

*Utah, N. & C.,* supra, taught us that the contractor should be relieved if he was misled by erroneous statements in the specifications.

" * * * the insertion of the articles prescribing the character, dimensions, and location of the sewer imported a warranty that, if the specifications were complied with, the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor to examiner the site, to check up on the plans, and to assume responsibility for the work until completion and acceptance * * *" United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

In United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920), the Government presented the contractor with an unrealized danger not unlike the instant situation—the contractor was furnished with a set of test borings which contained misleading statements, and the contractor was held to have been warranted in relying upon the showing of those borings, notwithstanding this statement contained in the specifications:

" * * * a number of test borings have been made for all of the areas where dredging is to be done under these specifications, and the results thereof may be seen by intending bidders on the maps on file in this office. No guaranty is given as to the correctness of these borings in representing the character of the bottom over the entire vicinity in which they were taken, although the general information given thereby is believed to be trustworthy."

Here the Contractor was furnished with drawing 1–2 (T.Ex. 104) entitled "Borings" which failed to disclose to the Contractor the above-mentioned contact with or striking of the conduit at Test Hole 1. The disclaimer in drawing 1–2 reads:

"Note: The government does not vouch for the accuracy of these bor-

ings. This sheet for information only. Any conclusions drawn from or implied by this information is at contractor's risk. Contractor absolves the government from any loss he might attribute to this information in foundation construction."

■ Neither this type of disclaimer nor the general statement, "Contractor shall contact Utility Companies for information pertaining to locations and construction of existing utility systems," subparagraph h., supra, is sufficient to relieve the Government from the positive teachings of drawings 1-1 and 1-2. The Court, in *Atlantic Dredging,* supra, tells us:

"The case is therefore within the ruling of United States v. Spearin, 248 U.S. 132, 136, 39 S.Ct. 59, 63 L.Ed. 166, where it is stated that the direction to contractors to visit the site and inform themselves of the actual conditions of a proposed undertaking, will not relieve from defects in the plans and specifications," (Citing *Hollerbach* and *Utah,* supra.) "It is held in those cases 'that the contractor ought to be relieved, if he was misled by erroneous statements in the specifications.' The present case is certainly within the principle expressed. * * * "

and upholds the contractor's contention of a right to seek recourse upon a breach of implied warranty in these words:

"The government makes the point, however, that the implication of the case is that bad methods were used, and insists that the implication makes the action one for a tort, and not tenable against the United States. We cannot assent. There is no intimation of bad faith against the officers of the Government and the Court of Claims regarded the representation of the character of the material as in the nature of a warranty; besides, its judgment is in no way punitive. It is simply compensatory of the cost of the work, of which the government got the benefit." *Atlantic Dredging,* supra.

I summarize this phase with the teachings of Morrison-Knudsen Co., Inc., v. United States, 345 F.2d 535 (1965):

"The * * * (Contractor) in submitting its bid and entering into the contract, had a right to rely upon the positive representations that were made by the * * * (Government) regarding the subsurface conditions that purportedly had been encountered in drilling holes 260 and 261 (as revealed here by drawings 1-2, Borings, and 1-1, Delineation of Course and Location of the Conduit) (citing Levering & Garrigues Co. v. United States, 73 Ct.Cl. 566 (1932)). "Such positive representations amounted to a warranty (*Atlantic Dredging,* supra), and established a predicate for a possible action for breach of contract when it was later discovered by the plaintiff that the defendant's representations concerning subsurface conditions at the two points were untrue (Ragonese v. United States, 128 Ct.Cl. 156, 163, 120 F.Supp. 768 (1954)). It was not incumbent upon the plaintiff, prior to submitting its bid and entering into the contract, to conduct its own investigation in order to ascertain the truth or falsity of the defendant's positive assertions regarding sub-surface conditions encountered in drilling holes 260 and 261, even though the contract contained a general condition stating that 'The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government,' and * * * that 'the Government does not guarantee that materials other than those disclosed by the exploration (i.e. the test borings) will not be encountered.' *Hollerbach,* supra, Flippin Materials Co. v. United States, 160 Ct.Cl. 357, 365, 312 F.2d 408 (1963)."

## CONTRACTOR'S SYSTEM AND EMPLOYMENT OF SHORING

I further find that:

Based upon the foregoing showing of drawings 1–1 and 1–2 and the then foreseeable hazards and dangers of sluffing and caving in, the contractor settled upon a shoring system composed of H steel beams as support piling with wood planking lags to be lowered by gravity or hammering as the excavation deepened to keep the bottom lagging tight against and into unexcavated earth;

Contractor's shoring plans were submitted to the Architects and by them approved, and neither the Architects nor the Government communicated any suggestions or objections to the Contractor's use and employment thereof throughout the excavation work;

This system is intended to hold up lands and fixtures adjacent to the excavation hole, and in this case, Contractor's employment thereof throughout the excavation work was a reasonably safe and workable system of shoring;

By the nature of the system a reasonable clearance is necessary to excavate under the bottom lag in order to again lower the lagging to unexcavated earth;

At the time of the cave-in with the resulting damage to the conduit, the lagging was held up by a mesa of unexcavated earth, leaving a bottom window of exposed adjacent excavation bank; [5]

The employment of large machinery is prudent until unreasonable sluffing appears or reasonable notice of an imminent outside danger is had, then light machinery or hand excavation is reasonably required in order to again lower the lagging;

No unreasonable amount of sluffing or other warning of an imminent danger had occurred until immediately prior to the cave-in on or about November 19, 1965.

I conclude on this phase that the system of shoring adopted and utilized by the Contractor under the plans and specifications was reasonably and prudently safe for the indicated purposes, and the Contractor's excavation work was conducted in a reasonably and prudently safe manner, except for the effect of the actual knowledge imputed to the Contractor that the conduit was within an immediate zone of danger from the required excavation work as will be developed.

## DEFENSE ASSERTED OCTOBER, 1965, CONFERENCE

Kenneth Custis was called as a witness for the Contractor and was identified as the Project Engineer for the Contractor. Under cross-examination it was developed that he was on the site— "Maybe two days a month," and had been on the site, "Roughly about 20 days" before the slide and cave-in on or about November 19, 1965.

Mr. Custis' version of the defense asserted October, 1965, meeting with supervisory personnel of Power is best gleaned from the words of the cross-examination:

"Q Do you have any way of determining now whether or not you were here on October 14th?

[5.] Royal Chappel, Project Administrator for the Government, testified in effect: He visited the building site for about three days each month. On a visit on Monday, November 22, 1965, in the morning hours, and the third day after the cave-in, he saw the window in the north line shoring, estimated to be six feet high, with the heavy excavation equipment in place, and placed the tongue of the sluffing and slide approximately 25 feet east of the west line shoring. The sluffing consisted of loose gravel and cinder material. While realizing clearance was necessary, six feet was "not good practice," and in good hindsight wisdom, stated, "I would rather have the lagging lower," and further stated that at that time the north bank was generally firm, perpendicular and not against the shoring.

"A Not with me, I don't.

"Q You have met John Adams and Mr. Bill Heineck who are here in the courtroom?

"A I know Mr. Adams, I don't remember any of the other gentlemen.

"Q Mr. Adams works for whom?

"A Washington Water Power.

"Q Now on October 14th, or thereabouts, did Mr. Adams and another man talk to you concerning danger to Washington Water Power Company utility lines?

"A Not to my recollection, I don't.

"Q You say not to your recollection. Is it possible that they did discuss with you on that date the danger to a power line near the northwest corner of the excavation?

"A I don't recall any conversation along this line.

"Q All right, you don't recall anything of that kind. Do you recall having gone to the northwest corner of the excavation on October 14th of 1965, or thereabouts, with Mr. John Adams and others?

"A No, I don't.

"Q Let me ask you specifically this, do you recall Mr. John Adams having told you that the actual location of power lines, of the power line at the northwest corner of the excavation was at a certain point located underneath where the sidewalk had been?

"A No, he did not.

"Q Did you and Mr. Adams go to the northwest corner at all in that time?

"A I couldn't say this because we were dealing with the electrical subcontractor here and working out arrangements for temporary power for this project. I couldn't say that I never visited the north site of this project with Mr. Adams, it was conceivable I could have." (Tr. p. 16, lines 14–25, p. 17, lines 1–23.)

Here follows discussion of temporary construction power sources.

"Q And now I will ask you specifically whether you weren't told and whether there wasn't discussion on or about October 14, 1965, between John Adams and at least one other representative of Washington Water Power Company and others from your firm, that there was a high voltage electrical line running underneath the area where the sidewalk had been, near the northwest corner of the excavation?

"A To my knowledge I wasn't told this, and in preparing for the H-pile shoring that we had around here, why we prepared a drawing giving the location of the pile we intended to drive, and had we known that this conduit, this high tension line was there, we sure would not have approached this in a manner that we could have conceivably killed somebody.

"Q On October 14, 1965, your piling was already driven, were they not, and you were already excavating?

"A I would have to check the dates on this." (Tr. p. 19, lines 18–25, and p. 20, lines 1–8.)

"Q You deny that anytime prior to the slide that anyone told you this power line that was damaged was running within five or ten feet of the excavation?

"A No.

"Q Pardon?

"A I had no prior knowledge of it.

"Q And you deny it?

"A Yes, I do." (Tr. p. 2, lines 12–19.)

"Q I believe you said on direct that if you had known there had been some electrical lines in the area where you were excavating that you would have uncovered them and supported those in some way, is that correct?

"A I am sure we would have.

"Q Exactly how would you do this?

"A We would have approached it with a small excavation machine or by hand, it all depends on the depth of it, but there would have been some hand excavation in the latter part of it anyway." (Tr. p. 38, lines 17–25, p. 39, line 1.)

As for Power's and the Government's version of the defense asserted October, 1965, meeting, a narrative of the testimony of two witnesses should be sufficient.

Witness John Adams, Superintendent of Power's steam heating plant, had personal knowledge of the actual course and location of the sub-surface conduit. He had calendar pad notes of October 13 and 21 of arranging for a meeting of Contractor's supervisory personnel. He, Messrs. Hobble and Heineck, supervisory personnel of Power, Mr. Custis of Contractor, Mr. McGough of Architects, and two representatives of the electrical contractor met at the site office in October, 1965. Messrs. Hobble, Heineck and himself went to Main Street where Mr. Hobble excitedly pointed out on the ground the true course and location of the conduit as it crossed under the south sidewalk area of Main Street using the test boring holes as reference.

Witness Heineck testified that he attended the Adams-Custis October meeting and had seen Mr. Erb, Contractor's Project Superintendent, at the Contractor's shack.[6] Mr. Erb and the electrical contractor's representatives remained at the shack as Messrs. Custis, Hobble, Adams and himself went to Main Street. Mr. Hobble emphatically pointed out the underground course and location of the conduit, using as reference points test holes and sidewalk surface markings made during repair or exploration of the conduit following its encounter by the test drill. At that time Mr. Custis was shown the drawing same as drawing 9–E–1 (T.Ex. 149).[1]

I find that the evidence preponderates in favor of Power and therefrom that:

The October meeting did occur and Custis did then obtain actual knowledge of the true course and location of the conduit and the extreme danger to its safety caused by the nearness of the conduit to the north perimeter of Contractor's excavation shoring;

This knowledge must be imputed to and Contractor is chargeable therewith,[8] and it failed to take reasonable precaution and exercise due care to protect the underground support of the conduit during the execution of its excavation work.

I conclude from the foregoing findings that:

Contractor's reliance upon drawings 1–1 and 1–2 became vitiated by reason of Contractor's imputed knowledge—of the true course and location of the conduit;

The imminent danger to the safety of the conduit and the resulting damage thereto was proximately caused by the Contractor's lack of due care and caution in continuing the utilization of heavy equipment in the excavation work rather than diverting to light equipment or hand work; and

That Contractor's complaint and cause herein must be dismissed.

I hazard this all is the result of a sinister risk that stealthily penetrated the vigilance and alertness of good supervision of good construction and architectural work resulting in a shouldering of the loss by a judicial determination of cold contractual duties.

6. I discount the probative value of the testimony of the two representatives of the electrical contractor. They each testified that the business shack had not been erected at the time of their meeting with representatives of Power as to temporary sources. A different meeting is indicated.

7. One of the H steel beams used as shoring support piling when drilled passed the shoring side of the conduit within 1–2 feet. The record is silent, but it was intimated in the cross-examination of Mr. Custis that the support piling had been drilled at the time of the October meeting. I think not, else the extended top of the piling 1 or 2 feet away from the conduit below surface would have been a red flag of danger to all present. One fears that this meeting made no impression upon Mr. Custis as to the variance between the location of the conduit on drawing 1–1 and 9–E–1.

8. For a classical restatement, see Busk v. Hoard, 65 Wash.2d 126, pp. 134–135, 396 P.2d 171 (1964).

The cross-complaint of the Government against the Architects and the Architects' cross-complaint against the Estate of Russell M. Spafford, Deceased, are now moot and must be dismissed.

It is my opinion that this litigation was instituted and prosecuted in good faith over privately undeterminable rights and duties and that no party herein should recover costs.

In view of the fact that an appeal of this cause is probable, I have endeavored to deal with all of the issues presented in the matter rather than the single one of actual knowledge, and this opinion, together with the admitted facts contained in the pretrial order, shall be and constitute this Court's Findings of Fact and Conclusion of Law herein, pursuant to Rule 52(a) of Federal Rules of Civil Procedure.

Counsel for Power, Architects, and the Estate shall submit appropriate orders of dismissal.