Campbell, Chief Justice,
delivered the opinion of the court:
The plaintiff made a contract to do all the work and furnish the material for the construction of Lock and Dam No. 29 in the Ohio-River, at unit prices. Among other requirements was certain excavation or dredging, for which the prices were fixed in the contract at 65 cents per cubic yard for “common excavation” and $8.60 per cubic yard for “ rock excavation.” The specifications provided for the classification of excavation into these two kinds and that “ common excavation shall include all material that can be removed with pick or shovel or by dipper dredge without blasting,” and that “ rock excavation shall include bowlders exceeding 9 cubic feet in volume and material requiring blasting for removal.” Logs, snags, and stumps were encountered in the early stages of the work, which were paid for as “common excavation” and were so classified in the monthly estimates made by the officer in charge, upon which the payments were predicated. The plaintiff claims that this classification was erroneous and seeks to recover the alleged cost of removing the logs, stumps, and snags, the excavation of which it is claimed was more . difficult and expensive than either “ common excavation,” properly considered, or “ rock excavation.”
The specifications provide that “ in all cases of disagreement on matters relating to material or work, the decision of the contracting officer shall be final.”
Section 8 of the contract provides:
‘‘No claim whatever shall at any time be made upon the United States by the contractor for or on account of any extra work or material performed or furnished, or alleged to have been performed or. furnished under or by virtue of this contract, and not expressly bargained for and specifically included therein, unless such extra work or material shall have been expressly required in writing by the *57 contracting officer, the prices and quantities thereof having been first agreed upon by the contracting parties and approved by the Chief of Engineers.”
The contract was awarded to plaintiff, under competitive bidding, in March, 1911. It became effective upon approval by the Chief of Engineers, in April, 1911. Work was begun in June, 1911, and was prosecuted actively for six months or more in 1911, for about the same period of time in each of the years 1912 and 1913, and for some months in 1914, being completed in October of the last-named year. For the work done during each of these months estimates were prepared, a retained percentage of 10 per cent of the several estimates was deducted, until the aggregate of the retentions amounted to the $40,000 mentioned in the contract, and payments were made accordingly. During all of that period the plaintiff received the payments without protest or objection, so far as the record discloses. When the final estimate was prepared in 1915, which included the amount of $40,000 that had been retained under section 20 of the specifications, the plaintiff insisted he was entitled to the additional sum here sued for, and he accepted the final voucher under protest with the announced purpose of suing for the amount claimed.
No bad faith is imputed to the officer making the classification, no objection to his classification was asserted when it was made, and if the material was not properly to be classed as either common or rock excavation there should have been a timely objection to the officer’s action. This would have enabled the parties to consider what course was to be taken in view of section 8, above quoted, of the contract. All of the work was upon the basis of unit prices, and when a character of excavation was found which plaintiff thought was not comprehended within the defined terms of the contract it became his duty to assert his claim to the end that the officer of the Government, acting for it, could consider what, if anything additional, should be paid, or what, if any, reclassification should be made. If the plaintiff did work which he did not contract to do it is too late to assert the fact after receiving payments based upon contract prices without objection or protest, and without an *58 observance of positive provisions of the contract. Plumley Case, 226 U. S., 545, 547; Wells Brothers Case, 254 U. S., 83; Gleason Case, 175 U. S., 588, 602.
While claiming, in the alternative, the alleged expense of removing the logs, snags, and stumps, the plaintiff’s claim is based upon a different theory than that suggested above, and states the question upon his brief as follows:
“ There is but a single issue: The right of the contractor to payment on a fair basis for the excavation or removal of certain snags, logs, and stumps not shown on the contract drawings or in the specifications, although the existence of same was known to the defendant.”
The proposition thus stated would apparently pretermit any inquiry into the question of plaintiff’s knowledge ot conditions, or of the means of knowledge, open alike to both parties, or of any duty upon the plaintiff to investigate for himself or to seek information or even to inquire of the defendant as to the extent of its knowledge or information; but without admitting the accuracy of a rule so broadly stated as it is by plaintiff, we think the evidence fails to show any misrepresentation by defendant or any warranty of conditions to be encountered, or a concealment that could be a misrepresentation or the basis of an action.
As already stated, the plaintiff’s contract was let in March, 1911. Prior thereto, in September, 1909, Government engineers had made certain borings — 36 in number — preliminary to the location of the proposed lock and dam, and for the purpose of determining tentatively upon an advantageous site. These are known as “preliminary borings,” and are to be distinguished from the final borings subsequently made. A record was kept of what these preliminary borings disclosed. At one of them, the location of which can not be determined, the record disclosed that a “ log next to rock ” was found. Having decided upon the location the engineers, in November, 1909, made what was called final borings, 42 in number, extending along the proposed lines of the two walls and guide walls of the lock and the upper and lower sides of the dam and abutment. The lock was located on the Kentucky side of the river. The dam extended across the river, and there were abutment walls on the Ohio side. The *59 land wall of the lock and its guide walls together extended about 1,800 feet up and down the river, the river wall of the lock was about 600 feet long, the dam proper was about 1,100 feet long, and the abutment wall was several hundred feet long. The borings were approximately 100 feet apart, except along the upper line of the dam they were 200 feet apart, and similarly along its lower line, but so “ staggered ” that they were approximately 100 feet apart, the distance between the two lines being about 29 feet. The results of these final borings were shown upon drawings. There can be no question that the drawings accurately portrayed all that these borings disclosed. A slight exception to this latter statement may be made in the fact that one of the final bor-ings disclosed “ wood and coal ” for about 6 inches, not shown on the drawings. But that fact is immaterial, because the boring was in the line of the dam several hundred feet from the places of which complaint is made, and does not appear to have caused any trouble. The wood and coal were probably remnants of a sunken coal barge that had been partly removed some time before.
The specifications, after describing the work to be done, state:
“ From borings and test pits, made at the site, it is assumed that rock will be found approximately as indicated on the drawings, but the United States does not guarantee the nature of the material to be encountered in the river bed, the correctness of the depth to rock as assumed or shown on the drawings, the depth to which it may be necessary to excavate, nor that the bottom of the river will not be changed before or after the commencement of work.”
Except as to the assumption that the borings might indicate the approximate depth to rock it is difficult to convert the language used into a representation of fact as to what was to be encountered. No question is made in this case that there was any mistake as to where the rock was found, but even “the correctness of the depth to rock as assumed or shown on the drawings ” was, by express terms, not guaranteed, which we understand to mean was not “warranted.” Nor was there any guarantee of the material that would be encountered in the river bed.
*60 statements in the specifications as to what was not guaranteed were part of the contract between the parties, binding no less upon the contractor than upon the Grpyernment. By accepting them, in the contract he executed, the plaintiff agreed that the Government was not guaranteeing conditions that might or would be encountered. It was perfectly competent for parties to so agree, and their agreement is controlling. Wells Brothers Case, supra.
But the plaintiff contends that the preliminary borings had developed that a log was found at one of them, and, although its location can not be determined, that the Government should have informed the bidders — or plaintiff particularly — of the fact. It is apparent that the drawings had reference to the final borings which were made for the purpose of developing, as well as they could, the depth to rock and afford means for estimates of the amount, and kind of excavation. There is nothing in the facts of the case, there is no representation made or drawing furnished, that misstated any fact or amounted to a misrepresentation by concealment or otherwise. It would be extending the rule further than the adjudicated cases have gone, and further than we are prepared to go, to say that the Government can be held, as upon a warranty, of a condition as to which it makes no representation, either by word or by drawing, when all it does is to furnish drawings which accurately state all they purport to show, notwithstanding it fails to state to the bidder that a hole was bored somewhere in or about the large area involved at some other time which disclosed that there was a log in the bottom of the Ohio River.
In the Christie Case, 231 U. S., 234, there was a positive statement that all information in the Government’s possession was accessible to the bidder, and the bidder was left in ignorance of it. It is conceded by plaintiff’s brief that no such specific representations as to the character of materials to be encountered were made in this case as furnished the basis of recovery in the Hollerbach Case, 47 C. Cls., 236; and whilst reliance is placed on the Christie Case, 237 U. S., 234, and the Atlantic Dredging Co. Case, 53 C. Cls., 490, the facts of this case are not similar to either of them. The statement in the Christie Case that the materials to be ex *61 cavated “ as far as known ” were shown by borings, “ drawings of which could be seen at the office of defendants’ agent,” was held to be a representation of fact when it developed that borings had been made, but not recorded, which showed a different kind of material from that shown on the drawings. In other words, the drawings did not show the character of material “ as far as known ” from the actual bor-ings. Similarly, in the Atlantic Dredging Company Case, as appears from the majority opinion, there was a positive statement which misrepresented the fact, as developed by the borings or soundings.
In the instant case the borings were made in November, 1919 (preliminary borings having been made in September) , and from these final borings the drawings were made in 1910; and the work let in March, 1911, was begun in June of that year. Thus, about 18 months elapsed between the times of the borings and the contract. The specifications declared that the Government would not guarantee that the bottom of the river would “not be changed before or after the commencement of the work.” There is no proof as to when the logs complained of became lodged in the river bottom; but if it be assumed that they were there when the borings were made there is no statement of fact that can be construed into a representation or warranty that they were not there, nor any withholding of information which the defendant undertook, or was bound, to communicate. Measurements of excavated material were to be based upon “ a survey of the river bed and banks ” to be made after the contract and prior to beginning work (see section 42, specifications), arid the plaintiff made no objection to the measurements or classification, as has already been stated. As stated by its counsel: il Materials of this character (i. e., ‘ snags, logs, and stumps ’) aggregated about 1,100 cubic yards, and it required about two months for the removal thereof.” It constituted a small part of the total excavation, which amounted to 108,264 cubic yards of common excavation and 18,182 of rock excavation, or a total of 121,446 cubic yards. The logs, stumps, and snags were encountered at the very inception of the work, and if the classification of them was not provided for by the terms of common and rock excavation, as used in the con *62 tract, or the plaintiff was dissatisfied with it as made, it was his duty to make clear his position. That course was at least indicated by the action of the subcontractor, who had undertaken the work under statements made to him by the contractor about the kind of materials to be dredged, and finding them different he called upon the contractor to alter their contract, which was done at once. It may be that the subcontractor’s undertaking to do dredging for 33 cents per cubic yard, for which the contractor was to receive from the Government 65 cents per cubic yard for one kind, and $3.60 per cubic yard for another kind-of excavation, may have had some influence on the latter’s willingness to so alter the arrangement as to retain the former’s services; but it is significant that while the subcontractor called upon his principal to alter their contract, the contractor did not see fit to make complaint to, or demand upon, the Government for a similar change in their contract, notwithstanding the express requirement in section 8 above quoted.. On the contrary, the work having been done largely, if not entirely, by the subcontractors, the plaintiff accepted the classification and payments therefor without protest.
These facts are at least suggestive of the view that the claim made nearly or quite four years after the work involved in the claim had been done was largely an afterthought. The plaintiff urges that the defendant knew of logs, stumps, and snags in the river, and did not communicate the- fact to him. He seeks to establish the fact by showing that in the course of some preliminary borings, a log was. located next to rock at a place of one of these bor-ings, not located, and that he relied upon the drawings.. But the findings do not state that he had no other means of information; nor does the law relieve him from making reasonable investigation and from the use of such means of information as the common knowledge of conditions in the Ohio River would develop. At any flood, it carried large quantities of drift composed of logs, stumps, and such like; a Government boat had for many years worked up and down the river to remove snags that interfered with or could obstruct navigation; the plaintiff’s president admits he had a general knowledge of the conditions, and some years before *63 this contract had examined conditions at Cairo. When plaintiff’s foreman commenced work there were logs and snags at or near the site that impeded the movement of its boat, and these were plainly visible at ordinary stages of the river. The facts show that between March 6 and 21, when the last bids were opened, the river was up and conditions below its surface were not visible; but the facts do not show what its condition was between the dates of January 20 and the opening of the first bids under the advertisements, which were in plaintiff’s hands on February 20. It does not affirmatively appear that plaintiff was not a bidder under the first advertisement. And it is a draft upon credulity to ask a court to believe that a responsible contractor would undertake to dredge material from the Ohio Biver and construct works that involved an expenditure by the Government of over $400,000 without any further knowledge or information about the difficulties to be encountered than the meager statement in the specifications as to what borings disclosed as to the depth to rock, with the accompanying statements that the Government would not guarantee the materials.
As was said by Mr. Justice Clarke in Wells Brothers case, supra: “Men who take million-dollar contracts for Government buildings are neither unsophisticated nor careless.” And it is to be borne in mind that if the plaintiff chose to make a bid on such short notice that he could not make a thorough investigation, he can not blame the Government for his action. It was entirely voluntary, and he was under no sort of compulsion to bid at all. The conclusion is inevitable that for the prices named in his proposal, and accepted, he was willing to take chances on the kinds of excavation, or whatever the dredging would disclose. When holes were bored about 100 feet apart, how could the Government know what lay between them? It is somewhat significant that the plaintiff had his derrick boat at the site of the work before and at the time of beginning work. Why a derrick boat if the material that was expected to be found could be removed with a dipper dredge without blasting ?
*64 Our conclusion is that on neither of the views presented by plaintiff is it entitled to recover. The petition should be dismissed, and it is so ordered.
Graham, Judge; Hat, Judge; Downet, Judge; and Booth, Judge, concur.