### 38155. STATE HIGHWAY DEPARTMENT v. MacDOUGALD CONSTRUCTION COMPANY.

DECIDED JULY 1, 1960—REHEARING DENIED JULY 21, 1960.

*Eugene Cook, Attorney-General, Paul Miller, E. J. Summerour, Assistant Attorneys-General, Donald E. Payton,* for plaintiff in error.

*Moise, Post & Gardner, Allen Post, Hugh E. Wright,* contra.

TOWNSEND, Judge. ■ Count 1 of the petition, which is the only count on which the plaintiff relies, seeks an ex contractu recovery of two amounts as follows: (1) The sum of $35,157.76 admittedly retained by the defendant out of the contract price, and sought by the cross-action to be set off, except for the sum of $1,498.95, as liquidated damages incurred by reason of delays in performance; (2) The sum of $33,967.31, which represents the difference between the contract price based on percentages of rock and dirt to be found along the sites to be excavated as indicated by borings made by the defendant, and the actual amounts of rock actually found when the excavations were made. The theory under which the plaintiff proceeded for recovery was that he was entitled to this corrected figure because of a mutual mistake of fact made by the parties in regard to the original contract. As the plaintiff's counsel succinctly states in his brief: "The plans as bid showed that 31.3% of the total excavation was rock. The rock as finally excavated was 36.2% of total excavation. The difference between these figures based on total excavation was 4.9%, but there was an 11% increase in rock alone. If plaintiff has no information concerning a job, plaintiff drills it. It did not drill this job because of preceding Expressway jobs where plaintiff had found defendant's drilling figures to be accurate. Plaintiff sees no use in wasting money when it expected to find only what defendant found when it drilled. Plaintiff could not have bid on this job without having something on which to rely as to the amount of rock present, because the cost of removing rock is so much greater than that of removing dirt. The amount of rock is specifically stated in defendant's plans on which it relied and bid. Plaintiff's mistake was in accepting defendant's figure as correct concerning the amount of rock and believing it to be true."

Accordingly, if the petition shows on its face that the plaintiff is entitled to an alteration of the contract price based on mutual mistake of fact he is entitled, as to (b) supra, to prevail; otherwise not. Whether he is so entitled must depend upon the terms of his contract, as contained in the plans and specifications. The plans and specifications, which are exceed-

ingly bulky, were not attached to the petition in the first instance although they form the basis of the contract sued on. The plaintiff subsequently amended his petition by stating: "Now comes the plaintiff and in this pleading makes profert of Standard Specifications for Construction of Roads and Bridges, Plans for Federal Aid Project No. FI-031-1(2) CT. 1, the proposal and contract therefor, which are here to the court shown. All of the said documents were prepared by the defendant." The court's order reads as follows: "Allowed and ordered filed and to be considered a part of the record for purposes of demurrer." Both parties, as well as the trial court, thereupon considered the plans and specifications as though the same had been in fact attached to the petition; they are before this court, and this court will also so consider them. *Chicago Building & Mfg. Co. v. Talbotton Creamery &c. Co.*, 106 Ga. 84 (1) (31 S. E. 809).

*Code* § 20-308 provides: "If the consideration be founded in a mistake of fact or of law, the promise founded thereon cannot be enforced." Under *Code* § 96-210, mistake of a material fact may in some cases justify a rescission of the contract; mere ignorance of a fact will not. "In all cases of a mistake of fact material to the contract or other matter affected by it, if the party complaining applies within a reasonable time, equity will relieve." *Code* § 37-206. "Equity will not reform a written contract, unless the mistake is shown to be the mistake of both parties; but it may rescind and cancel upon the ground of mistake of fact material to the contract of one party only." *Code* § 37-207. "If a party, by reasonable diligence, could have had knowledge of the truth, equity shall not relieve; nor shall the ignorance of a fact, known to the opposite party, justify an interference, if there has been no misplaced confidence, nor misrepresentation, nor other fraudulent act." *Code* § 37-211.

In *Hargrove v. Bledsoe*, 78 Ga. App. 107 (50 S. E. 2d 223) it was held that in an action at law a plea based on the defense of mistake of fact must allege the mistake, and that there was no negligence on the part of the complaining party, as fully as though the petition were one in a court of equity, and the following was quoted from *Langston v. Langston*, 147 Ga. 318 (93 S. E. 892): "Where the terms of an instrument express

the intent of the parties at the time the contract is made, as they are then informed, in the absence of any allegation of fraud, misrepresentation, or misplaced confidence, equity will not interfere to relieve on account of ignorance of a fact by one of the parties, if by exercise of due diligence he might have ascertained the truth."

Testing the petition by the law relative to this subject matter, paragraph 10 recites: "In making its proposal and bid to defendant, petitioner bid for the removal of 241,113 cubic yards of rock, and defendant invited bids on the same basis, and petitioner did not test and could not reasonably have tested the rock that had to be removed, but was authorized to rely and did rely upon the representations of defendant in connection therewith, and there was a mutual mistake of fact between plaintiff and defendant, in the amount of the said excess stated above, with relation in the amount of rock that had to be removed in this construction."

Section 2.06 of the specifications provided: "The bidder is required to examine carefully the site of, and the proposal, plans, specifications and contract form of the work contemplated and it will be assumed that he has judged for and satisfied himself as to the conditions to be encountered, as to the character, quality and quantities of work to be performed and the materials to be furnished, and as to the requirements of these specifications, special provisions, and contract. No adjustments or compensations will be allowed for losses caused by failure to comply with the above requirements." Section 2.05 provides: "The bidder's attention is directed to the fact that the quantities of work to be performed and materials to be furnished to complete the construction of the project, as indicated on the plans and contained in the 'Proposal Form' are considered as approximate and are to be used only for the comparison of bids. The department does not guarantee or assume any responsibility that the quantities indicated on the plans or given in the 'Proposal Form' will hold in the construction of the project, and the contractor shall not plead deception or misunderstanding because of the variation of these quantities, or variation from the location, character, or any other conditions pertaining there-

to." Section 104.05 provided: "The yardage of roadway and drainage excavation measured as provided above shall be paid for at the contract unit price per cubic yard for 'Common Excavation' . . . 'Unclassified Excavation' . . . as the case may be, which price shall be full compensation . . . Payment will be made under . . . Item No. 104-E. Unclassified Excavation— per cubic yard." Unclassified excavation, under Section 104-02 consists of "roadway and drainage excavation performed under this item, regardless of the materials encountered or the manner in which they may be removed." The plaintiff's itemized bid was on the basis of "unclassified excavation." The plans submitted showed the result of test drillings, on which the percentages of rock and dirt in the unclassified excavations were calculated, but recited: "Date shown on plans regarding classification, location, and/or extent of soil or rock in roadway at structure sites or in pits are based on field investigations and are believed to be indicative of actual conditions. The data are shown as information only, are not guaranteed, and do not bind the State Highway Department in any way."

To summarize, the plaintiff's petition shows that there were three ways of paying for excavation based on the number of cubic yards removed: one on a certain price per yard of dirt, one on a price per cubic yard of rock (which was more costly) and a third per cubic yard of unclassified material, that is dirt and rock in whatever combination they might be found. The plaintiff undertook to bid on this basis, after being fully informed that, while the results of the defendant's test drillings were available to him, and represented all the knowledge that the defendant had on the subject, the plaintiff must bid on his own judgment. The contract might well have provided that the cost would be estimated on the relative amounts of dirt and rock so far as excavation was concerned; it did not do this, but the plaintiff bid on unclassified material, and took his chances that it would be in the relative percentages of material revealed by the State's borings. It is a fair adverse inference from the pleadings that the plaintiff could have conducted its own test borings but chose not to do so; as stated above, the briefs of counsel concede this fact.

In *Morrow Transfer & Storage Co. v. Wells Bros. Co.*, 26 Ga. App. 366 (106 S. E. 200) it was held to be no breach of the contract to require a subcontractor to make alterations found necessary in order to erect a proper building foundation, made necessary because of unexpected soil conditions found during excavation, and "more especially is this true when the contract states that test borings and samples of the soil have been made and are subject to the inspection of bidders, but that the soil conditions are not guaranteed."

The defendant in error in support of his contention that because the rock content of the material removed was higher than that anticipated he is entitled to extra reimbursement, relies on a number of foreign decisions holding that where the contracting authority represents that certain soil conditions will be found, even though it undertakes not to be bound by such representation, this is a warranty a breach of which will give the bidder a right of action. See United States v. Utah, Nevada & California Stage Co., 199 U. S. 414 (26 S. Ct. 69, 50 L. Ed. 251); United States v. Atlantic Dredging Co., 253 U. S. 1 (40 S. Ct. 423, 64 L. Ed. 735); Potashnick v. U. S., 105 F. Supp. 837; Passaic Valley Sewerage Com'rs. v. Holbrook, Cabot & Rollins Corp., 6 F. 2d 721; Pitt Const. Co. v. City of Alliance, 12 F. 2d 28. Many of those cases present special circumstances, chief among which is a situation where the contracting authority, although in possession of additional information, fails to divulge it; none is controlling on the facts here presented. It is the duty of our courts, where the contract is clear and unequivocal and violates no rule of law or public policy, to give it full effect and to exercise caution in judicially rewriting its terms because of an alleged mistake of fact. *Rose City Foods v. Bank of Thomas County,* 207 Ga. 477 (62 S. E. 2d 145); *Prince v. Friedman,* 202 Ga. 136 (42 S. E. 2d 434).

It is perfectly obvious that when these parties contracted they both knew they would have no final and absolute measure of the rock content of the soil until the conclusion of the excavation. Both knew they could contract on an estimate subject to revision when the rock content had been measured. However, the plaintiff bid and the State contracted, not on this basis,

but on the basis of unclassified material. The plaintiff was credited with all such unclassified material excavated at the agreed contract price. All that this petition shows is that it is dissatisfied because it elected to contract on the basis of an estimate which has proved to have some measure of error. The fact that the estimate might be erroneous was well known to both parties; the plaintiff neither desired to make its own estimate nor to contract against error in the estimate as made by the State, and it has shown no such diligence as will sustain this part of the action. The general demurrers to paragraphs 10 and 16 of the petition were erroneously overruled.

■ The defendant's cross-action seeks a judgment in its favor for $35,157.76 of which $33,658.81 was retained by it out of the contract price, representing liquidated damages for delay on the part of the plaintiff contractor in failing to finish the work within the requisite number of days set by the contract. The plaintiff claims that although it overran its time, both the 250 working days allowed in the original contract and the 335 day total eventually allowed by the State Highway Department because of additional work demanded during the completion of the job, it should not be charged for the 126 working days used between January 24, 1955, when work was commenced and September 5, 1955, when the Department acquired by condemnation the last of the property involved in the project.

It was recognized before work was commenced that all of the project had not been acquired as of the time of the issuance of the first order to commence work, and the Department demanded and received a letter from the plaintiff to the effect that the plaintiff would make no claim against it for delay due to the failure of the Department to turn over the entire project in the first instance. The plaintiff contended, however, that the plaintiff's inability to obtain certain parts of the right-of-way resulted in its not being able to place dirt when it dug it out of a cut and in not being able to work in a cut when the right-of-way containing it was not obtained, and that the plaintiff had to move machinery and equipment back and forth, which costs money and lost time because it was heavy equipment; that if it had had all of the right-of-way in the first instance

it could have completed the job within the number of days allowed because of the fact that it could have handled the job more efficiently; that in the plaintiff's 20 years of experience in like contracts it had uniformly been the practice, when a contractor requested extra time and no reply was made to the letter that the extra time was allowed as a matter of course, and that in the instant case the plaintiff had no notice that the defendant sought to penalize it for overrun of time until after the action was brought. The plaintiff requested extensions of time on November 25, 1955, on April 24, 1956, and twice in September, 1957. Paragraph 8.09 of the contract specifications provides: "If the contractor finds that it will be impossible for him to complete all the work within the contract time fixed in the original notice to contractors and the proposal, he shall, at least prior to the expiration of such contract time, make written request to the Department for an extension of time for completion. He shall set forth fully therein the reasons which he believes will justify the Department in granting his request. He shall enumerate the work orders, extra work orders and supplemental agreements which he considers as having a bearing on such extension of contract time and shall also set forth a revised detail progress schedule which shall provide that the remaining work will be completed on or before the amended contract time requested. If the Department finds that the work was delayed on account of unusual conditions beyond the control of the contractor, or that the quantity of work done or to be done is sufficiently in excess of the original contract quantities to warrant additional time, the Department will, with or without notice to the surety, grant an extension of contract time as appears to the Department to be reasonable and proper. This extension of contract time will thereafter be as binding on the contractor and surety as if it appears in the original contract."

The penalty clause contained in paragraph 8.10 is as follows: "Should the contractor . . . fail to complete the work within the time stipulated in the contract, or within such extra time as he may be allowed as herein above provided, a deduction of the amount incurred by the Department in engineering costs

will be made for each and every calendar day that such contract remains uncompleted after the expiration of the number of working days allowed for completion. The amount of engineering costs is hereby agreed upon as liquidated damages . . ." It is further contended that the part of paragraph 8.08, which provides that any objection to a weekly decision of work days by the engineer shall be final unless the contractor protests the same within 3 days, cannot apply where the defendant first breached its contract by not delivering to the plaintiff the complete site of the work at the beginning of the contract, and that although the plaintiff agreed not to make any claim against the defendant on account of delay in turning over the completed site, it nevertheless did not agree to be penalized if the failure of the defendant to turn over the completed site resulted in the plaintiff having to operate in a more ineffective manner and consequently to take more time in completing the project. In this regard, there is also provided in paragraph 4 of the contract signed by the parties the following: "The decision of said State Highway Engineer upon any question connected with the execution of this agreement or any failure or delay in the prosecution of the work by the said contractor shall be final and conclusive."

In *State Highway Dept. v. MacDougald Construction Co.*, 189 Ga. 490. (6 S.E. 2d 570) it was held: "Where, in a contract between a contractor and the State Highway Department for surface treatment of a road, it is stipulated that a decision of the State Highway Engineer upon any question connected with the execution of the contract should be final and conclusive, his decision upon any such question should be held binding upon the parties, in the absence of fraud, or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment . . . In such case, the finality of the engineer's decision will depend, not on its correctness, but on whether it was tainted with fraud, or was so grossly erroneous as to imply fraud, bad faith, or failure. to exercise an honest judgment." It will be noted in the contract under consideration that paragraph 8.08 of the specifications relating to computation of time deals with "working days" which are defined by reference, and

constitute days in which more than five hours of work are done, excluding Sundays and holidays. Weather conditions are paramount in computing working days. The engineer is named the sole judge of working days in one sentence of this paragraph, and in another it is stated that objections to his weekly decisions shall be held waived unless objection is made within three days. On the other hand, paragraph 8.09 deals with extensions of time "on account of unusual conditions beyond the control of the contractor" and makes the Department itself the proper authority to whom the request for extension shall be made. The contention that the plaintiff did not object to the weekly decisions of the engineer within three days as to number of work days reported per week did not bar it from requesting an extension of time on the basis that failure to acquire part of the right-of-way in the first instance slowed its operations, nor was it barred by the letter in which it agreed to make no claim against the State for such procedure, it not agreeing in such letter to accept a penalty against itself because of such failure on the part of the State.

However, the evidence is sufficient to present a jury question on whether the defendant should be allowed liquidated damages for delay on account of the admitted overrun in time, or whether the fault lay with the defendant as to any or all of the time charged so as to preclude it from claiming such damages. Where failure to obtain the work site is the cause of delay in completing the contract within the days specified, the authority has no right to claim damages, this not being the fault of the contractor. Sheehan v. City of Pittsburgh, 213 Pa. 133 (62 A. 642); United States v. United Engineering & Contracting Co., 234 U.S. 236 (34 S. Ct. 843, 58 L. Ed. 1294); King Iron Bridge & Mfg. Co. v. City of St. Louis, 43 F. 768, 769; Guerini Stone Co. v. P. J. Carlin Const. Co., 248 U. S. 334 (39 S. Ct. 102, 63 L. Ed. 275); Dumke v. Puhlman, 62 Wis. 18 (1); Strobel Steel Const. Co. v. Sanitary Dist. of Chicago, 160 Ill. App. 554. As stated in United States v. John Kerns Const. Co., 140 F. 2d 792, 795: "The law is universally recognized that where a party to a contract agrees to do something prior to a day certain and in default to pay a sum of money as liquidated damages, if the

other party to the contract engages in conduct which prevents the doing of the thing contracted for in the specified time, such action amounts to a waiver of the claim for liquidated damages for delay." However, to constitute such waiver the delay in acquiring the site must be the proximate cause of the delay in completion of the contract; mere delay in acquiring a part of the site which the contractor knew was not acquired at the time it entered into performance of the contract and which was not at that time needed by it in order to perform its work efficiently or competently would not contribute to any delay, if acquired and turned over to the contractor at the time it was needed in the progress of the work. The evidence is not such as to permit this court to say as a matter of law that the plaintiff failed to show any defense against the liquidated damages sought to be assessed against it.

■ Special ground 10 of the amended motion for a new trial complains of the charge of the court on the subject of waiver, a part of which was as follows: "The following are some acts which will constitute a waiver of a time set for performance under a contract: accepting benefits arising under the contract after discovery of the alleged breach; an insistence on performance after the date of maturity and acceptance of performance after that date  .  .  .   recognizing the contract as still being in existence after the expiration of the time for performance; accepting performance after expiration of the time stipulated for performance.  .  .  If you find, gentlemen of the jury, that the defendant failed to deliver the site of the work involved in the contract in this case in sufficient time so that the plaintiff could have performed all of its work within the time provided for by the contract as amended and if you find that the defendant later accepted plaintiff's work under the contract, the defendant would by such acts have waived its right to damages against the plaintiff for delay on the part of the plaintiff.  .  . If you find that plaintiff did not complete its work under the contract as amended within the time provided for therein and if you find that the delay was caused by both the acts of the plaintiff and the acts of the defendant, then you will allow the defendant no damages in its cross-action against the plaintiff

for delay because there can be no apportionment of damages if they are caused by the mutual fault of both parties. . . If you find from the evidence that the plaintiff did not complete the work it was required to do by the contract as amended within the time provided for therein but that after such time for completion had expired the defendant allowed the plaintiff to proceed with the work without raising any question as to delay or making any claim for liquidated damages therefor before filing this suit then the defendant would have waived the time of completion of said work and is not now entitled to any damages provided in said contract as amended to be paid by the plaintiff for its delay in completing the work."

That part of the charge last above quoted is equivalent to directing a cross-verdict against the defendant's cross-action for the reason that the evidence is undisputed that the plaintiff did not complete the work within the time required and that the defendant allowed the plaintiff to proceed without raising any question as to delay. The plaintiff, well aware that an overrun in time was likely, itself raised the question, first by its letter of November 25, 1955, in which it protested the charge against it of 136 working days prior to the acquisition of the final right-of-way strip on September 5, 1955, and again in three other letters running through September, 1957. It was well aware that the credit had not been granted it because the weekly time sheets so showed, and its continuing letters of protest show this fact. It was also aware after the work was completed on July 23, 1957, that the Department continued to withhold from its contract price the sum of $35,157.76, recognizing all the while the existence of paragraph 7.15 of the specifications contracting against waiver on the part of the Department, and providing in part: "Neither the acceptance of the Department, of any representative of the Department, nor any payment for acceptance of the whole or any part of the work, nor any extension of time, nor any possession taken by the Department, shall operate as a waiver of any portion of the contract or of any power herein reserved, *or any right to damages herein provided.*" (Emphasis added). As quoted above, paragraph 8.10 contained the provision that an overrun

of time not allowed by the Department would authorize a deduction of the Department's daily engineering costs from the contract price for each calendar day of overrun. Thus, the contract itself provided the penalty for failure to complete on time, and did not contemplate that failure to complete the contract would be such a breach as would terminate the contract, or that the Department, by allowing the contractor to complete the job, would waive its right to the penalty provided in the contract itself.

The charge that if both the plaintiff and the defendant were at fault there could be no apportionment of damages, while a correct rule of law, was inaptly applied in this case and might well have confused the jury into believing that either the defendant was entitled to the whole 136 days of liquidated damages or that it was entitled to none of them. As a matter of fact there was considerable evidence going to the question of which parcels of land the plaintiff needed in order to conduct its operations efficiently at different stages of the progress of the work, which extended from January, 1955, to July, 1957. A number of the work sites which the defendant had no title to in January, 1955, were acquired very shortly thereafter, within 30 or 40 work days. Most of them were acquired within 70 work days. The last two were not acquired until after 126 work days, but these two small pieces of land were at the extreme far end of the project. While the jury would not apportion damages in the strict sense of the word, it would nevertheless have to decide whether any, some, or all of the work sites not acquired interfered with production so that they should not be strictly counted against the plaintiff, and accordingly as they found that these separate sites bore on the delay they would be authorized to find that the Department should have granted extensions of time as to some work sites, but perhaps not as to others. The charge of the court to the effect that recognizing the contract as still being in existence after the expiration of the time stipulated for performance would or might amount to a waiver was confusing in the context given, since the contract stipulated the penalty for such event. The charge that if the defendant failed to deliver the work site in sufficient

time so that the plaintiff could have performed all the work within the contract time, this would be a waiver of the right to damages, was correct, but it was not correct to add "and if you find the defendant later accepted plaintiff's work," since mere acceptance did not, without more, preclude the right to insist on such damages. The charge on this subject was tantamount to directing a verdict in favor of the plaintiff on the issue of the defendant's cross-action, and constitutes reversible error.

■ Complaint is made in special ground 8 that the court charged at length on the construction of contracts, including the rule that where any part of the contract is doubtful, vague, or ambiguous, it should be construed most strongly against the party preparing it, and also including all of *Code* §§ 20-702, 20-703 and 20-704. Where contracts are unambiguous it has been held error to submit their construction to the jury. See *Brand v. Lawrenceville Branch R.*, 77 Ga. 506 (1 S. E. 255). That part of *Code* § 20-704(3) relating to custom and usage has been held to be erroneously given in charge when there is no evidence to support it. *Robertson v. Wilder & Co.*, 69 Ga. 340 (2). Nevertheless, a part at least of the charge excepted to was not error, and the assignment of error is not sufficiently specific to warrant reversal insofar as it affects the defendant's cross-action. It was undoubtedly error in submitting to the jury the interpretation of the contract provisions dealing with the method of charging for excavation of rock and dirt, in that it allowed them to find that the contract was subject to the construction attempted to be placed on it by the plaintiff in contravention of the plain and unambiguous wording of the instrument, but this issue is now moot since we held in division 1 hereof that the petition was, for the same reason, subject to general demurrer. Likewise, special grounds 1, 2, 3, 7, 9, 11 and 12, dealing with evidence admitted under the allegations of the petition, are moot and will not be passed upon.

■ Special grounds 4, 5 and 6 deal with oral and documentary evidence which is necessarily admissible under the ruling which we made in division 2 hereof, since it concerns the acquisition of rights-of-way, the agreements between the parties as

to the effect which such acquisition should have on the plaintiff's originally undertaking the contract, and the subsequent effect which failure to make immediate acquisition had on the plaintiff's operations in the excavation process. These special grounds are without merit.

The trial court erred in overruling certain general demurrers to the petition, and in overruling the motion for a new trial.

*Judgment reversed. Felton C. J., Carlisle, Nichols and Frankum, JJ., concur. Gardner, P. J., dissents. Bell, J., disqualified.*

GARDNER, Presiding Judge, dissenting. The majority of the members of this court have agreed that this case should be reversed. I am firmly convinced to the contrary, and in support of my conviction that the case should be affirmed, I am setting out the pleadings and the evidence as fully as if I were writing the majority opinion.

A brief summary of essential facts shows that this case is based on a contract between MacDougald Construction Company, a corporation (hereinafter called the plaintiff) and the State Highway Department of Georgia (hereinafter called the defendant).

It is alleged that the plaintiff was damaged by the defendant in the sum of $69,125.07 because of alleged breach of contract. The defendant admitted it owed the plaintiff $35,157.76. The plaintiff, in making his bid, calculated excavations on the basis of .18 per cubic yard on the removal of dirt and .915 per cubic yard on the removal of rock. The bidding on the part of the plaintiff and the letting on the part of the defendant was for the total excavation of 771,148 cu. yds. which included 530,035 cu. yds. of dirt (designated as "common") and 241,133 cu. yds. of rock. Actual quantities, including revisions by adding additional work not included in the original plans, brought the total to 959,274 which included 612,879 cu. yds. of dirt and 346,395 cu. yds. of rock.

This case proceeded to trial before a jury. The jury returned a verdict for the amount for which suit was brought. The defendant filed a motion for a new trial on the statutory grounds and added twelve special grounds by amendment. The trial

court overruled the amended motion for a new trial. It is to the judgment overruling the motion for a new trial, the court's ruling on the demurrers, and the ruling on the plea in bar that the case is here for review.

The record shows stipulations between counsel as follows: That "as to the third item of the contract which originally called for 771,148 cubic yards unclassified excavation, borrow, including ditches, at a price of 41 cents per cubic yard, that they actually removed 959,274 cubic yards of the unclassified type of excavations, and that 36.2% of such excavation was rock, which amounted to, as finally performed by MacDougald Construction Company, 612,879 cubic yards of dirt and 346,395 cubic yards of rock"; that a document which was identified as P-10, dated September 23, 1957, should be admitted into evidence without proof of its authenticity; that certain letters could be tendered in evidence without further proof of their authenticity; that there was no issue for failure to have the claim arbitrated. It was further stipulated that the defendant held $35,157.76, which was due the plaintiff under the contract, subject to the claim of the defendant against the plaintiff as set forth in a counter-suit. It was also stipulated that the "plaintiff made a motion at the nonjury hearing in this case to strike defendant's plea in bar, and that the judge passed on said motion, and ruled: 'defendant's plea in bar be and the same is hereby overruled on each and every count'."

The evidence shows substantially as follows: R. F. Holahan, vice-president of MacDougald Construction Company, a witness for the plaintiff, testified as a registered engineer, having worked for the plaintiff for about eighteen years; that he physically handled the making up of the bid under consideration. He testified that "there is a method by which it is possible to approximate the amount of rock which will be encountered in the construction of a project—take a drilling auger out to the field and sink it into the loose dirt and locate the surface of the rock, and from that compute the body, quantity of rock." The witness also testified that there was a portion of the job for which neither the plaintiff nor the defendant had plans. He stated: "We did some drilling in that section but we had no

elevations on which to drill to find whether there was rock or not. The remainder of the job we did not drill; we did not drill anywhere the State had drilled. We did not drill anywhere in the area shown on the plans on which we made our bid. . . . There was a note in the proposal when we bid that there would be a change made and plans would be furnished at a later date, but they were not furnished at the time we bid." The witness testified that on previous jobs the plaintiff had found the quantities shown on the plans had been very accurate. He stated: "I took the figure of 241,133 cubic yards of rock as given on the plans and arrived at a cost figure of $220,619. That is 91½¢ per cubic yard for the rock. That left 530,035 cubic yards of dirt which costs less to move, and the total for that was $95,403.00, which gave me the price of 18¢ per cubic yard[?], which gave me the price of 41¢ per cubic yard on unclassified excavation. . . I knew the proper way to investigate it was to bore it and I knew borings had been made." The witness testified that the plaintiff made a formal claim under oath relative to the matter upon which suit is brought and filed it with the State Highway Department, and the defendant refused to consider the claim, and that the plaintiff also attempted to arbitrate the matter and the defendant declined to arbitrate; that claims for increased time were not contested by the defendant up until after the suit was filed; that the witness first learned of the penalty against the plaintiff some time after the suit was filed; that delay in completion of the job was caused by the delay in acquiring the right-of-way for the project and that such acquisition was the responsibility of the defendant; that the witness had prepared proposals for many projects; that in order to make a bid on the project the plaintiff had to buy a set of plans for $40 and pay $5 for the proposal forms; that "I understood that 'rock is not mentioned in the contract.' Unclassified excavation mentioned in the contract consisted of roadway and drainage excavation regardless of the materials encountered or the manner in which they might be removed. I understood that provision of the contract to mean anything that might be found at the site—rock, marble, iron or gold. . . . Over the years that we have been bidding on contracts

I have become familiar with the procedure for testing soils to determine the amount of rock in the soil . . . The amount of work on this job was increased . . . We didn't bore this job because we relied on the defendant's figures and I bid on this job for the plaintiff without going to the site of the job and without making an examination of the soil . . . On this job I relied on what the State Highway Department said in their plans and made a mistake; and I want the State Highway Department to pay for their mistake . . . I don't want them to pay for my mistake. I bid the job without boring it and without sending any men in to make tests to see how much rock was there because I thought surely they wouldn't deliberately put the wrong figure down." The witness testified that when the job was increased from $1,000,000 to $1,400,000 and the working days were increased from 250 to 335, the plaintiff was charged with 461 days and that "we protested those [meaning those figures] from the beginning . . . When I prepared the estimate for this type of bid I did not take into consideration the availability of the rock because there was no rock shown available, no waste rock to crush . . . The original plans show 31.3% of the entire excavation designated by the State Highway Department to be solid rock; the actual quantities within the scope of the work covered by the original plans was 764,324 cubic yards and 42.9% of that was solid rock; which was an increase in the volume of rock within the original scope of the work of 11.6%, which is 37% increase. The witness testified that on previous bids the plaintiff had found the quantities of rock set up to be accurate and that in view of that record there was no use in wasting money in drilling.

Frank D. Nichols testified that at no time was anything said by the defendant about charging the plaintiff for delay on the project when "they couldn't even let us on the land," but that the defendant added a penalty; that the first knowledge the witness had that time had been charged the plaintiff for the overrun of days was on the pre-trial statement by defendant's counsel.

Sam C. Inman testified substantially that it was a handicap to be unable to get certain parts of the right-of-way from time

to time because this made the disposal of dirt more expensive; that failure of the defendant to get the right-of-way caused delay and inconvenience. He stated: "If we had the whole thing to start on we could have completed it inside the number of days required by the contract. We would have put sufficient equipment and men on the job to do it inside the time. If we had acquired all of the right-of-way it would have taken the same time to do the work done in 7 months regardless but had we been working on the control point of the job, that rock, in this estimated time, that would have gone along in this 7 same months."

Alex MacDougald testified that he had had long experience in removing rocks and that "sometimes we bore a job and sometimes we don't . . . We bid to carry out the plans and if they have requested a bid based on information that they furnish us and if there is less rock or more rock an equitable adjustment is in order . . . The provision of the plans says that the State Highway Department doesn't guarantee or assume any responsibility that the quantities indicated on the plans or given in the proposal form will hold in the construction of the project, but doesn't say that the contractor has got to move more rock than shown."

Other witnesses testified that more rock was found than the plans showed.

Roscoe C. Tate, a design engineer with the State Highway Department, testified that the defendant puts any material difficult to classify under the heading of unclassified excavation; that it is a problem to tell where the rock is until it is uncovered. The witness also testified that the plans did not show or attempt to show the exact amount of rock or any other material in the proposed project.

Grady P. Holcomb testified that he never received a complaint about the excess rock, but on cross-examination he testified, "I didn't say that there never was a complaint made to the State Highway Department about excess rock. I know there was a complaint made. I don't positively know that there was excess rock, more than shown in the original plans."

I am convinced that so far as the general grounds are con-

cerned the evidence is ample to support the verdict of the jury and the judgment of the Superior Court of Fulton County based thereon. This court has many times held that it is beyond the scope of the appellate courts to overthrow the verdict of the jury which is manifestly correct. And I do believe this verdict is correct. The trial court approved the verdict as rendered by the jury and I see no cause or reason whatsoever for reversing that ruling. This is a voluminous record consisting of 454 pages. The briefs contain over 200 pages. The case was tried by an able Judge of the Superior Court of Fulton County. It took a long period of time to try the case. To my mind the evidence is clear and conclusive. I think the charge of the court shows meticulous accuracy in covering the law applicable to the evidence. I see no errors which were made during the trial of the case and I believe all the special grounds to be without merit. It is also my belief that the plea in bar was properly overruled and that there was no error made in any rulings on any of the demurrers. I reaffirm my position that this case should be affirmed.