KNIGHT BROS., INC., AND E. STOLTENBERG & SON, A JOINT
VENTURE, APPELLANTS, V. STATE OF NEBRASKA, APPELLEE.

199 N. W. 2d 720

Filed August 4, 1972. No. 38376.

Hird Stryker of Fraser, Stryker, Marshall & Veach, for appellants.

Clarence A. H. Meyer, Attorney General, Warren D. Lichty, Jr., Gary R. Welch, Dale L. Babcock, Jr., and Randall E. Sims, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

CLINTON, J.

This action originated with a claim arising out of a contract of the plaintiffs with the Department of Roads of the State of Nebraska, which claim was filed under the provisions of section 77-2406, R. R. S. 1943. The claim was disallowed. Appeal was then made under section 77-2407, R. R. S. 1943, to the district court for Lancaster County which found for the defendant. The plaintiffs then perfected their appeal to this court.

The plaintiffs, a corporation and a partnership, respectively, were as joint venturers the successful bidders for the construction of work under Federal Aid Interstate Project No. I 80-4(26) in Lincoln County, Nebraska, and on February 18, 1965, entered into the contract with the State of Nebraska. Insofar as is here

immediately pertinent the plaintiffs under the provisions of the contract were to place and compact approximately 2,560,000 cubic yards of embankment material for a 7.902-mile segment of Interstate 80 southeast of North Platte, Nebraska, at a price of 29.5 cents for each cubic yard of such materials measured in the embankment. The plaintiffs completed the work and were paid for the placement of the material in the embankment at the contract price.

This cause of action is founded upon certain purportedly false representations allegedly knowingly or negligently made by the State in the contract documents as to the quantity and quality of the material available in certain borrow pits referred to in the specifications. Plaintiffs alleged in their petition that the claimed representations were made by the State with the intent that the bidders rely thereon and that the plaintiffs did in making their bid and in entering into the contract rely thereon. The plaintiffs further claim that the quantities were insufficient and the material in one certain pit did not meet specifications.

The position of the plaintiffs may be succinctly stated by the following quotations from their brief: "On the quantity issue, it is the Plaintiffs' position that it was the intent of the State and the understanding of the Plaintiffs that the five pits shown on the plans would provide sufficient material to complete the project; and that if they did not, the contract documents contemplated and required that the State pay the Plaintiffs the extra costs incurred in procuring the necessary additional material from other sources. A subsidiary issue is the Plaintiffs' claim that it was also the intent and understanding that material from certain of the designated pits would be utilized for specific segments of the embankment. . . .

"On the issue of the substandard quality of the material in one of the pits, . . . it is the Plaintiffs' position that the proper test to be applied in determining whether

the material in that pit was 'acceptable in general' and, hence, fulfilled the State's representations, was not whether the State ultimately authorized and directed its use in the embankment, but rather, whether the material that was so used, in fact, met (or could be made to meet) the quality standards prescribed by the specifications; and that the testimony of the State's own witnesses established that the difficult to excavate and manipulate material from that pit that was used in the embankment was cohesive rather than granular in character, and did not meet, and could not be made to meet, the quality standards upon which the Plaintiffs' bid was based and the contract awarded.

"It is also the Plaintiffs' position that when the substandard character of that pit was discovered, it was the State's duty, under Paragraph 5 of Article 6.02 of the Standard Specifications, to authorize the Plaintiff to abandon it, and procure material that would meet the specifications from other sources, and to reimburse the Plaintiffs for the extra costs incurred in so doing. It is the Plaintiffs' position that the State's refusal to authorize the abandonment was also a breach of the contract for which the Plaintiffs are entitled to recover their resultant damages."

The State denied making false representations as to quality or quantity; denied reliance by the plaintiffs and alleged full knowledge on the part of the plaintiffs; and alleged that the quantities and qualities were sufficient, that the plaintiffs did only what the contract provided, and that the prolongation of the work was caused by the plaintiffs' improper procedures.

The trial court found generally for the defendant and against the plaintiffs; that there were no misrepresentations; that paragraph 4 of Article 6.02 of the Standard Specifications was the governing provision of the contract; that the joint venture suffered substantial loss in the performance of the contract but it was unnecessary to determine the amount of loss because the defendant

was not liable; and then dismissed the plaintiffs' petition. We affirm the order of the trial court.

In order to convey an adequate understanding of the issues and the contentions of the parties it is necessary to set forth by quotation, or in summary, pertinent contract provisions. The contract consists of a 2-page executed agreement which incorporates numerous documents. Included among these is the proposal. The proposal provides: "We have carefully examined the plans and specifications for the work contemplated in this proposal and we have made a personal examination of the site and have inquired into the local conditions affecting the work. We propose to furnish all the necessary equipment, machinery, tools, apparatus, and other means of construction and to do all the work *and to furnish all the materials* to complete the work in accordance with the plans and specifications on file for the schedule of prices listed in this proposal." (Emphasis supplied.)

Also included are the State of Nebraska 1965 Standard Specifications for Highway Construction. Article 2.07 provides: "Article 2.07—Examination of Plans, Specifications, Special Provisions, and Site of Work

"The bidder is required to examine carefully the site, and the proposal, plans, specifications, special provisions, and contract form, for the work contemplated, and it will be assumed that *the bidder has investigated and is satisfied as to the conditions to be encountered, as to the character, quality, and quantities of work to be performed and materials to be furnished,* and as to the requirements of these specifications, the special provisions, and contract. It is mutually agreed that the submission of a proposal shall be considered prima facie evidence that the bidder has made such examination." (Emphasis supplied.)

Article 6.02 of that document is in part as follows: "Article 6.02—Designated Local Material Sources

"1. Sources of local materials may be designated and

described in the plans and special provisions. The quality of material in such deposits will be acceptable in general, but the contractor shall determine for himself the amount of selective excavation, blending, screening, mixing, and other work required to provide a finished product meeting the specifications. It shall be understood that the engineer may order procurement of material from any portion of the designated option area and may reject portions of the deposit as unacceptable.

"2. When material deposits are not designated in the plans or special provisions, the contractor shall provide material conforming to the specified requirements.

"3. The department may acquire and make available to the contractor the right to take materials from the sources designated in the plans and described under special provisions, together with the right to use such property as may be specified, adjacent thereto, as may be required for plant site, stock piles, and hauling roads. Any special requirements required by the terms of options will be shown in the plans.

"4. If the contractor desires to use materials from sources other than those designated, he shall, at his own expense, explore and develop such other sources and request in writing, the engineer's approval of the alternate source or sources stating that he will acquire the necessary right to take the materials and pay all costs involved, including any which may result from an increase in length of haul. The use of materials from other than designated sources will not be permitted until representative samples taken by the engineer have been approved and written authority issued for the use thereof. Approval of the use of materials from such alternate sources will not be given unless the quality of the material therefrom is at least equal to the quality of material from the designated source or sources.

"5. Should the engineer find it necessary or desirable, during construction to change from a designated local material source to another not designated in the

plans or described in the special provisions, due to depletion of the material, variation in gradation of material, or to the locating of a more suitable material, the work of moving from one source to another and any additional stripping or hauling of the material, and any other additional costs occasioned by such change shall be considered as 'extra work'."

In the case of this contract certain local material sources were designated. These were set forth in the sheets containing the plan and profile of the highway. These material sources were borrow pits numbered 1, 16, 20A, 12, and 23. These were described by tract, number, owner, terms of option under which the material might be used, that is, whether a lump sum payment or a per acre cost, and the estimated cost. In the case of pits Nos. 1 and 20A the cost was designated as "free." These two pits had apparently been acquired by the State by eminent domain. These specifications provided: *"Pit Nos. 1 and 20A are required to be used."* (Emphasis supplied.) The specifications as to these two pits further set forth the maximum cubic yards available in the pits and *the minimum cubic yards required to be removed.* As to the other pits the maximum cubic yardage available was designated but none was required to be removed. Evidence introduced at the trial indicated that the purpose of the *required* excavation of the two pits was to use them as a part of the Interstate chain of lakes. The record also discloses that where the State has acquired title to borrow pits by eminent domain but does not use them the federal government does not reimburse the State for its 90 percent of the cost.

The sheets on which the compaction requirements for the embankment appear contain the following: "The contractor will be required to furnish the borrow on this project," and also provide, with exceptions, that the embankment should be constructed of "granular materials having at least 90 per cent retained on the

No. 200 sieve and at least 10 per cent retained on the No. 10 sieve."

The first basic question in this case is whether the contract is reasonably subject to the interpretation that it made representations that the quality of the materials in Pit No. 1 were of such a nature that they could be excavated and processed without undue difficulty. There is convincing evidence in the record to support the position that the material in Pit No. 1 had a deeper and more variable layer of very cohesive overburden than the plaintiffs anticipated and that there were pockets of cohesive material in lower levels. In the course of excavation and processing some of this cohesive material became mixed with the granular material and the plaintiffs had great difficulty in handling and processing the material. The State did in fact waive in part the sieve retention requirements earlier quoted as to a portion of the material in Pit No. 1 for use in certain portions of the embankment. There is evidence which supports the conclusion that with this waiver there was sufficient select material in Pit No. 1 to complete the work on that portion where Pit No. 1 material was being used. The State also lowered the minimum cubic yards required to be removed, but the plaintiffs did in fact remove and use more than the minimum required even under the original specifications. Evidence was introduced by the State which would support a finding that the plaintiffs' problems in Pit No. 1 were caused by their use of improper dewatering and material handling methods. Early in the work the plaintiffs obtained privately and used material from what is identified as the Krychek Pit in portions of the embankment which were being built by material from Pit No. 1. The request for this substitution stated: "We will furnish the material at no additional cost to the State." The responsive authorization from the State said: "1. It is understood that the substitute source is granular material; but that in any case the specified gradation re-

quirements listed on sheet No. 3 of the plans and any other requirements of the plans and specifications will be complied with. 2. That you will pay all royalty and any other additional costs involved in the substitution of this material. 3. That approval of the substitution of embankment material described herein, in lieu of material from the pits shown in the plans, does not alter the requirements specified in the plans for the plan pits."

The contractual provisions to which we have earlier made reference plus those which we now set forth do, in our opinion, negative as a matter of law a representation as to quality and so in effect of the workability of the material such as the plaintiffs claim. Furnished with and included in the plans and specifications were the results of test borings made by the State of the pits including Pit No. 1. The specifications sheets containing this information have the following stated thereon: "The information shown on these plans represents the physical characteristics of the material at the locations indicated. *No quarantee is made regarding the nature of the material at points other than locations sampled.*" (Emphasis supplied.) There is no contention made by the plaintiffs that the summaries of the soil material information based upon the borings is false or inaccurate.

The plaintiffs in effect argue that the language of Article 6.02, provision 1, of the Standard Specifications as follows: "The quality of material in such deposits *will be acceptable in general, . . .*" (emphasis supplied), constitutes a representation to the bidder that the bulk of the material will meet the sieve standards and so be readily workable without undue difficulty. We do not believe this is, in light of the whole contract, a reasonable interpretation thereof. We believe it means that the State will accept the material generally and if it does not, but rejects it, or a portion of it, and on that account the contractor is directed under provision 5 to

another material source, then he is entitled to reimbursement for the "extra work" involved.

In addition to the disclaimer of any quarantee the provisions of the specifications that the engineer "may reject portions of the deposit as unacceptable" clearly negatives any representation that the deposit will meet any specific standard. This is also indicated in the language, "The contractor shall determine for himself the amount of selective excavating (etc.)."

We find nothing in any of the provisions of the contract which would restrict the right of the State to waive specifications by loosening the material standards. The contract, as we have noted, provides that the material "will be acceptable in general." This language certainly is at least inclusive of the right of the State to waive material specifications.

Another aspect of the contract insofar as it pertains to Pit No. 1 may be mentioned. The excavation of the specified minimum cubic yardage from Pits Nos. 1 and 20A was a part, even though an incidental part, of the performance of the contract. Had this not been done the contract, in the absence of a waiver, would not have been completely performed.

In support of their claim for "extra work" the plaintiffs cite Pitt Constr. Co. v. City of Alliance (6th Cir., 1926), 12 F. 2d 28. That case involved a contract for the construction of a concrete basin. The backfill was to be provided from the materials excavated from the basin. The plans provided there would be approximately 9 feet of material to be excavated from the basin site. There was actually only 3 feet of material available. The contractor brought an action to recover the additional expense incurred as a result of the deficiency in material and was allowed recovery. There was in that case a positive representation. Here there was none. As far as Pit No. 1 is concerned this case comes within the purview of those cases where performance of a construction contract is more difficult or burdensome than

anticipated. At 3 Corbin on Contracts, § 598, p. 590, we find the following: "The risk of unexpected cost and difficulty in the performance of construction contracts is usually carried by the building contractor. Of course, the employing owner may make representations or warranties; and the parties may by agreement allocate such risks as they see fit. Every case stands on its own legs; there is no rule of law with an answer mechanically determined." At 17A C. J. S., Contracts, § 367(1), p. 374, we find: "If the contract is fairly entered into by an experienced builder, the fact that a portion of the work proves to be more expensive than was estimated does not entitle the builder, in the absence of fraud or mistake, to any allowance beyond the contract price." This court has followed the same general principles as to contracts generally. Wilson & Co., Inc. v. Fremont Cake & Meal Co., 153 Neb. 160, 43 N. W. 2d 657. Applicable cases from other jurisdictions are: State Highway Dept. v. MacDougald Constr. Co., 102 Ga. App. 254, 115 S. E. 2d 863. That was a case where test borings were made by the highway department and the contractor relied thereon. The contract contained a provision stating the data was not guaranteed. See, also, Gillespie Land & Irr. Co. v. Hamilton, 43 Ariz. 102, 29 P. 2d 158; Bates & Rogers Constr. Co. v. United States, 56 Ct. Cl. 49; Leary v. City of Watervliet, 222 N. Y. 337, 118 N. E. 849.

Insofar as there is conflicting evidence as to the quality of material in Pit No. 1 and as to the cause of the problems of the plaintiffs in processing the material in that pit, we take into consideration that the trial court seems to have decided these issues adversely to the plaintiffs we apply the following principles. The judgment of the trial court in an action at law where a jury has been waived has the effect of a verdict of a jury, and will not be set aside unless clearly wrong. In determining the sufficiency of the evidence to sustain a judgment in a law action, it must be considered most

favorably to the successful party, every controverted fact must be resolved in that party's favor, and he must have the benefit of any inferences reasonably deducible from it. Parsons Constr. Co. v. State, 180 Neb. 839, 146 N. W. 2d 211.

The next question we consider is whether the contract documents contain a representation by the State that the material in the pits contain sufficient material to complete the embankment in accordance with the specifications. The trial court made no finding as to whether there was an actual deficiency, but the evidence would support a finding that there was.

There is in the contract no express representation that the quantities in the local material source pits would be sufficient to complete the embankments, but the plaintiffs' argument apparently is that there is an implied representation. In that respect we find the contract somewhat ambiguous. As already noted, certain provisions of the contract call for the contractor to furnish the material and except for the two pits required to be used he must pay for the material used from the designated pits. The ambiguity arises from certain provisions of Article 6.02. It says: "2. When material deposits are not designated in the plans or special provisions, the contractor shall provide material conforming to the specified requirements." One might imply from the last provision that it is only where sources are not designated that the contractor must locate and supply (as distinguished from "pay for," which, except for "free" material he must do in any event) the required material. This provision taken together with the language of provision 5 of Article 6.02 which provides that where the engineer designates a change in sources because of "depletion of the material" the contractor will be paid for "the work of moving from one source to another and any additional stripping or hauling of the material," might possibly lead to the conclusion of a representation as to the sufficiency of quantities. A

contract is ambiguous when, considered as a whole, it is capable of being understood in more senses than one. 17A C. J. S., Contracts, § 294 (b) (2), p. 34.

In this light we apply the following principles. "Where a contract is ambiguous, the court must determine the parties' intent; and an ambiguity must be resolved so as to give effect to that intent." 17A C. J. S., Contracts, § 295 (f), p. 65. See, also, 1 Corbin on Contracts, § 95, p. 397. The interpretation given a contract by the parties themselves while engaged in their performance of it is one of the best indications of their true intent and should be given great, if not controlling, influence, and the court should ordinarily enforce such construction. Enterprise Co., Inc. v. Nettleton Business College, 186 Neb. 183, 181 N. W. 2d 846; McLeod v. Crawford, 176 Neb. 513, 126 N. W. 2d 663; Podewitz v. Gering Nat. Bank, 171 Neb. 380, 106 N. W. 2d 497; Restatement, Contracts, § 235 (c), p. 319; 17 Am. Jur. 2d, Contracts, § 274, p. 686; 17A C. J. S., Contracts, § 325 (2), p. 246. "Where evidence relating to ambiguities and contradictory provisions in a written contract is conflicting, the interpretation to be given the contract is for the jury." Ely Constr. Co. v. S & S Corp., 184 Neb. 59, 165 N. W. 2d 562. In this case where a jury was waived the question was for the trial judge and with the same effect as a jury verdict.

The record establishes that in addition to the material from the designated pits the plaintiffs obtained material from the following pits: Krychek (mentioned earlier), Northwest Engineering, Stenger, No. 14, and from an unidentified pit in the river bed.

On April 26, 1965, Stoltenberg in writing requested permission to use pit No. 14, stating: "We have made an agreement with the landowner." The Department of Roads approved the request on April 28, 1965, stating as a condition: ". . . you will pay all royalty costs and that the use of this material will result in no additional costs to the State." On April 29, 1965, he asked for per-

mission to use the Northwest Engineering pit. Permission was given on April 30, 1965, on the same condition. On April 7, 1965, in response to both a verbal and written request the Department of Roads gave permission in writing to Knight to use the Krychek pit upon the same conditions. On June 11, 1965, Knight in writing requested permission to use material from the stream bed "at no extra cost to the State of Nebr., and will provide for the access to this material." Permission was given. On October 20, 1965, permission was given to use the Stenger pit under similar conditions.

The contract itself and the circumstances surrounding its execution are pertinent. The contract makes a representation of the *maximum* cubic yardage available in the designated pits. It says this is the most you can get out of them and except for Pits Nos. 1 and 20A there is no representation of the least amount available. Plaintiffs and the State were both aware that other material was available in the vicinity. All parties knew that a yard of material compacted and measured in the embankment together with waste would require substantially more than a yard of material measured in the pit. This factor varies, but it is 1.3 or more apparently. The plans and specifications make no representation of this factor. The plaintiffs were experienced grading contractors and were as capable of making a determination of the quantities of material required in place to complete the contract as was the State.

The finding of the court that the plaintiffs understood that the contract made no warranty as to quantities is justified by the evidence.

The above holdings are determinative and it is not necessary to consider other assignments in connection with the rejection of evidence offered by the plaintiffs. The judgment of the trial court is affirmed.

AFFIRMED.